*THE PEOPLE *vs.* WHITE.*          [ *520 ]

Where in an indictment for *murder* the crime is charged to have been committed with a *premeditated design to effect the death of the person killed,* the premeditated design or *express malice* must be proved, or the prisoner cannot be convicted, although the act be *also* charged to have

* Decided 28th December, 1840.

been done with *malice aforethought;* the description of the character of the crime, viz. its perpetration with a *premeditated design,* cannot be rejected as surplusage.

Where a judge, in his charge on the trial of a criminal case, after alluding to the benefit of good character to the accused in a doubtful case, called the attention of the jury to the *absence of such proof* in the case before them, *it was held* that he had erred, and a new trial was granted.

From both these propositions the CHANCELLOR dissented.*

THE prisoner was convicted in July, 1839, at the New-York oyer and terminer, of the murder of one Peter Fitzpatrick. The first count of the indictment charged, that the prisoner, on the 13th of February, 1839, with force and arms, &c. at the first ward of the city of New-York, in and upon Fitzpatrick, *feloniously, wilfully and of his malice aforethought,* and from a premeditated design to effect the death *of Fitzpatrick,* did make an assault; and with a certain knife, &c. in and upon the groin of Fitzpat-

[ *521 ] rick, *feloniously, \*wilfully and of his malice aforethought and from a premeditated design to effect his death,* did strike and thrust, &c. thereby giving him a mortal wound, of which he instantly died. The indictment contained a second count charging that the prisoner on, &c. at, &c. feloniously, wilfully and *of his malice aforethought, and by an act imminently dangerous to him the said Peter Fitzpatrick, and evincing in*

---

* The above propositions the reporter considers as settled by the decision of the court of errors. Beside which *it was held:*

By the CHANCELLOR and *Senators,* DIXON, EDWARDS, FURMAN and VERPLANCK, that the *second associate judge* of the common pleas of New-York may preside in the court of oyer and terminer of that city and county, *in the absence* of a judge of the supreme court, a circuit judge or the first judge of the county, but cannot act *conjointly* with either of those officers. *Senator* WAGER holds that he has no power under any circumstances to preside in that court.

So it was held by the CHANCELLOR, and *Senators* DIXON, EDWARDS, FURMAN, ROOT, VERPLANCK, and WAGER, that the *aldermen* of the city and county of New-York may preside in the court of oyer and terminer of that city and county: at all events, that their *power* to do so cannot be collaterally inquired into.

So it was held by the CHANCELLOR, and *Senators* EDWARDS, VERPLANCK, and WAGER, that a *memorandum in pencil,* purporting to be the examination of a witness taken on an *ante mortem* inquisition by a coroner, was *in itself* inadmissible in evidence for the purpose of impeaching a witness, or as not being duly authenticated. From this opinion *Senator* FURMAN dissents.

So it was held by the CHANCELLOR and *Senator* VERPLANCK, that the retiring from the bench by a judge after the commencement and before the termination of a trial, will not affect the validity of the trial, provided a *quorum* competent to proceed in the trial be left. From this opinion *Senator* FURMAN dissents.

How far the acts of the judges *de facto* will be sustained, discussed by the CHANCELLOR, Mr. *Justice* BRONSON, and *Senators* DIXON, FURMAN, ROOT and VERPLANCK; and the right of *a party affected* to raise on writ of error an objection to the due organization of a court, discussed by the CHANCELLOR and *Senator* VERPLANCK.

The CHANCELLOR holds in this case, that the court for the correction of errors will listen to an objection *appearing on the record,* although not urged in the supreme court, if it be of such a character that had it been presented there it could not have been obviated by the opposite party

*him* the said *Ezra White* a depraved mind regardless of human life, did make another assault, and with a certain knife, &c. in and upon the right groin of him the said Peter Fitzpatrick, with a *depraved mind regardless of human life*, feloniously, wilfully and of his malice aforethought did strike, stab and thrust, &c.

At the trial, the counsel for the prisoner took a bill of exceptions, in which it was stated that the cause came on for trial at a court of oyer and terminer, held in and for the city and county of New-York, on the 10th July, 1839, before the Hon. Ogden Edwards, circuit judge for the first circuit, William Inglis, one of the associate judges of the court of common pleas for the city and county of New-York, appointed under and by virtue of the act of 1st April, 1839, entitled " an act to repeal the seventh section of the act *relating to the court of common pleas for the city*, &c. and to authorize the appointment of an additional judge ;" *and    [ *522 ] Egbert Benson and Elijah F. Purdy, aldermen, &c. Under this organization, Judge Edwards presiding, a jury was empannelled, a tales directed, challenges decided, witnesses examined, and the opinion of the court pronounced by Judge Edwards on several questions that had arisen as to the admissibility or rejection of testimony, without any intimation that he intended to abandon the *bench* during the progress of the trial ; he then withdrew and continued absent during the remainder of the trial. Judge Inglis and the two aldermen remained, and they presiding, the trial was continued. The indictment against the prisoner was found at the New-York general sessions, in which the *recorder* and two of the *aldermen* of the city presided.

William H. Wright, a witness for the people, testified that he knew White ; that he, the witness, was at the house of one Lawrence Gaffney (where there was a house-warming) several times in the course of the night in which the homicide was committed ; and gave evidence tending materially to fix the offence upon the prisoner. Wright had been examined before the police, and his deposition taken there was read in evidence by the counsel for the prisoner. He there stated that he did not know White's name at the time ; but now knew it. He was now cross-examined as to his deposition before the police, and said : " I did not express any doubt about who did the act. I did not then recollect his name." He admitted that he had been examined before the coroner, on the occasion of the ante-mortem inquest on Edward Dennon, who, as it now appeared, was wounded by the prisoner in the same affray. The inquest was taken February 13th, and was admitted by the district attorney, to have been duly filed by the coroner. There was an endorsement on it in pencil in these words: " *Witnesses.* Wm. H. Wright. Is a watchman. About 3 o'clock this morning, came along, &c. and found they were quarrelling, &c. and told the young men to go away. One of them came up and jerked the door open, and saw him make a motion to

stab ; and from the action of his arm have no doubt he did stab him, &c. Soon after saw him make another stab at another man, and he [ *523 ] fell. The first man did not fall. *Did not see but one man use any instrument. *Edward Dennon* was one of the party, &c. was stabbed, and did not know by whom, &c. *Doctor Charles Fitzpatrick* says he was called to this house about 3 o'clock ; found the wounded man Dennon, &c."

The inquisition and the endorsement thereon were offered in evidence for the purpose of contradicting Wright's testimony on this trial. The district attorney objected to the reading of the endorsement, on the ground that it should first be proved that the testimony was reduced to writing from the witness' statement. That it was evidently, on its face, an imperfect statement ; and not a part of the inquisition. That it had no *official signature*, or *authentication*, and might be a mere private memorandum of the coroner, or of some other person made for his own use. The court decided that the inquisition was admissible, but excluded the statement endorsed thereon. The prisoner's counsel excepted.

Judge Inglis charged the jury that the terms *premeditated design*, as used in the statute and in the *first count* of the indictment, were tantomount to and conveyed the expression of the same idea as the words *malice aforethought*, used at common law, and found in this count ; that if the first count was to be regarded as framed under the statute, the words *malice aforethought*, might be regarded as *surplusage ;* that if viewed as a count at common law, it was sufficient, and the addition of the words *premeditated design*, did not affect its validity ; and the first count was sufficient to comprehend *any of the grades or classes of murder* embraced in the first and second subdivisions of the fifth section of the title of the statute treating of crimes punishable with death. 2 *R. S.* 657. And that if the jury should be of opinion that the killing of the deceased took place *either from premeditated design to effect the death of the person killed, or any human being*, or *that it was perpetrated by an act imminently dangerous to others, and evincing a depraved mind, regardless of human life*, although without any premeditated design to effect the death of any particular individual, the crime fell within the common law *definition of *malice aforethought*, and that if the facts so warranted, it would be their duty under the first count of the indictment to convict the prisoner. He further instructed them that it was not necessary that *express malice*, or a *premeditated design* to take the life of the deceased or of any other human being, should be proved : that the jury might draw the inference of the existence of such malice or premeditated design from the facts accompanying the killing, however suddenly the act might have been committed. He instructed them to exclude from their consideration the *second count* of the in-

dictment, because it was not alleged therein that the killing was perpetrated by an act imminently dangerous to other persons as well as the deceased. He further charged the jury, " that in all doubtful cases, where the scales of justice are nicely poised, the evidence of a good character and a virtuous life, had great weight in turning the balance in favor of the prisoner ; and in this case there was an absence of such testimony on the side of the prisoner." The jury found the prisoner guilty. The counsel for the prisoner having taken various exceptions to the decisions of the court and the charge of the judge, and procured a bill of exceptions to be signed, the sentence of the law was suspended and the proceedings were removed into the supreme court by certiorari, to obtain the advice of the court. The case was argued in that court, and the court ordered the record to be remitted with directions that sentence be passed on the prisoner. See 22 Wendell, 167, et seq.

Sentence was accordingly passed by the oyer and terminer, but a writ of error having been sued out by the prisoner, his execution was respited by the governor from time to time until the judgment of this court was pronounced. When the case was before the court in 22 Wendell, 167, it was there by certiorari, and to enable the prisoner to carry it up to this court, a writ of error was sued out removing the record from the oyer and terminer into the supreme court. In the record thus removed were inserted the facts suggested as necessary, in 22 Wendell, 174, to present the question arising on the retiring of the circuit *judge from the bench. The cause [ *525 ] was argued in the supreme court on the record being brought in, by

D. Graham, jun., for the prisoner.

J. R. Whiting, (district attorney) for the people.

After advisement, the following opinion was delivered :

By the Court, BRONSON, J. The questions arising on the bill of exceptions were considered when this case was before us on a former occasion. 22 Wendell, 167. Those points are now only made pro forma, and we have nothing to add in relation to them.

The only question mentioned on the argument, was one in relation to the organization of the courts before which the prisoner was indicted and tried. It is insisted on his behalf that the aldermen of the city of New-York could not rightfully sit in those courts. It is not denied that the aldermen have been declared, by law, judges of the criminal courts of the city and county of New-York ; but it is said, that the acts of the legislature conferring this authority, are repugnant to the constitution, and therefore void. That ques-

tion we have just considered in the case of *The People* v. *Varian and others ;* and we do not think it necessary to add any thing to what has already been said. We entertain no doubt that the statutes in question are valid, and that the aldermen were fully authorized to sit in the courts of general sessions and oyer and terminer, where the indictment was found and tried.

II. But if we are mistaken in saying that the statutes are valid, there is another principle which must control this case. If the aldermen were not judges *de jure*, they were, at the least, judges *de facto*, with color of legal title ; and no principle is better settled than that the acts of such persons are valid when they concern the public, or the rights of third persons who have an interest in the act done. It would be impossible to maintain the supremacy of the laws, if individuals were at liberty, in this collateral manner, to *question the authority of those who, in fact, hold public offices under color of legal title. Where there is a plain usurpation of an office without any show of title, the acts of the intruder will undoubtedly be void, both in relation to individuals and the public. But where there is color of lawful title, the officer must be obeyed and his acts respected, until judgment of ouster is pronounced against him in the proper proceeding for that purpose. The government may try the right by *quo warranto ;* and the title of the officer may also be questioned where he is a party, and is sued for an act done which he can only justify as an officer. *Fowler* v. *Beebe,* 9 *Mass. R.* 231. But this is a case where officers having apparent authority to do the act, have rendered judgment between the people and the prisoner, and neither party can, in this collateral way, call in question the title of the judges. If there had been judgment of acquittal, it would have concluded the people, and the prisoner could not have been further prosecuted.

[ *526 ]

To hold that the acts of such officers as I have mentioned are not binding, as between third persons, would lead to the most serious consequences. No man would be safe in taking a title until he had examined the commission of the judge or other public officer who had done any act upon which the validity of the title depended, and had then gone from the commission up to the source from which the officer derived his authority. We have recently rendered judgment of ouster against a county clerk—*The People* v. *Vail,* 20 *Wendell,* 12—and yet it cannot admit of a doubt, that the acts which he did while in under colour of election, such as the recording of deeds, administering oaths, entering verdicts, and the like, are just as valid as they would have been had the judgment been the other way. Still more recently, we have pronounced judgment of ouster against a police justice of the city of Albany, *The People* v. *Kane,* 23 *Wendell,* 414 ; but those who executed his mandates while he held under the forms of law, are as perfectly protect-

ed as though there had been no defect in his title ; and his orders and judgments, so far as they operate between other parties, are as valid and effectual as though *he had been an officer de jure. These [ *527 ] cases are only mentioned by way of example. The rule is universal.

It was suggested at the bar that the rule did not apply in the case of a person exercising a *judicial* office ; but no case to that effect was mentioned, and it would be strange if one could be found. The question has, no doubt, most commonly arisen in relation to ministerial officers, but, on looking into several of the cases, I find no such distinction as that which the counsel supposes should exist. In *The King* v. *Lisle*, *Andrews*, 163, it was said, that the rule comprehended both " judicial and ministerial acts ;" and in *McInstry* v. *Tanner*, 9 *Johns. R.* 135, it was objected on a *certiorari* to reverse a judgment, that the justice who rendered it was constitutionally disqualified to hold the office ; and it was answered that had the objection been well founded in point of fact, " it might well be questioned whether the court could take notice of such an objection, in this way, since we are to intend that the justice acted under a regular commission; and he has not been put to answer for an unconstitutional exercise of power." Now, here the commission of the aldermen is written in the statute book, and surely no one can question their title on a writ of error. It must be tried in another form. *See also Viner's Abr. Officer and Offices*, ( *G.* 4,) and *Harris* v. *Jays*, *Cro. Eliz.* 699, where it is said, that the law favors acts of one in a reputed authority." In *Bucknam* v. *Ruggles*, 15 *Mass. R.* 180, the court said the rule extended to *all* public officers, and that they could discern no reason for restraining it ; and in *Wilcox* v. *Smith*, 5 *Wendell*, 231, it was applied in the case of a judicial officer. It would be strange, indeed, if the judgment or decree of a court of competent jurisdiction could be impeached on the ground that a flaw had been discovered in the commission of the judge.

We are of opinion, upon both grounds, that the objection taken by the prisoner's counsel to the title of aldermen cannot prevail. Judgment affirmed.

The case was thereupon removed into *the court for the correction of errors*, where it was argued by

*D. Graham, jun. & S. Stevens*, for the prisoner.           [ *528 ]

*J. R. Whiting*, (district attorney) and *Willis Hall*, (attorney general,) for the people.

After advisement the following opinions were delivered :

By the CHANCELLOR. Several questions were raised in the supreme

court, and have also been discussed in this court upon the writ of error; some of which relate to the organization of the court and the jurisdiction of the officers before whom the trial was had, and others to the legality of the decisions made in the progress of the trial. This last class of questions I shall first proceed to consider.

The first of this class is as to the right of the court to proceed with the trial after one of the judges, who was present at the commencement of such trial, had left the bench;' admitting that the remaining judges would have been legally competent to hold a court of oyer and terminer and to try the offence, if the trial had commenced before them alone. Upon this point I have no doubt; for the revised statutes expressly provide, that each justice of the supreme court and each of the circuit judges shall have power to hold any circuit court, and to preside in any court of oyer and terminer in this state, either for the whole time for which such court shall continue, or for any part of that time. 2 *R. S.* 203, § 14. There would indeed be an impropriety, where there was but one judge present who was competent to preside, in permitting him, unless in a case of absolute necessity, to leave the bench after the jury had been empannelled and a part of the testimony given, and allowing a new judge who had not been present during that part of the trial, to take his place, before the cause had been finally committed to the jury for *their decision.* It is not to be presumed, however, that any judge would so far forget his duty as to leave the bench, under such circumstances, except in a case of sickness or other imperious necessity; and this court, upon a writ of error, would not be justified in presuming he did so, especially in a trial involving the life *of a prisoner, unless the fact distinctly appeared upon the record. But even should such a case occur, or if by the sickness or death of the presiding judge during the trial, it should become necessary to substitute a new one in his place who had not before been present, I see no principle of law which would require the empannelling of a new jury; though it would undoubtedly be proper to re-examine the witnesses before such substituted judge, unless the parties would consent that he should take a statement of the evidence, and of the previous proceedings upon the trial, from the notes of the former presiding judge, or from his associates on the bench. This, however, is not a case of that kind, provided the trial was properly commenced before the four judicial officers who were present at the commencement of the trial, and if the last three were competent to hold a court of oyer and terminer without the presence of the circuit judge; for in that case there was no necessity of commencing the trial *de novo*, as all the remaining judges had been present from the commencement of the trial, and knew what had taken place as well as the judge who had left the bench, for some good reason as we must presume. I believe, it is no uncommon thing in all courts, in criminal proceedings as well

[ *529 ]

as in civil suits, where at the commencement of the trial there are more judges on the bench than the law requires to form a quorum, for some of those judges to leave the bench and for the others to proceed with the trial, provided the judges who remain are legally competent to hold the court. And certainly if the chief justice and one of the associate justices of the supreme court, together with two other judges authorized to sit with them or either of them in the court of oyer and terminer in the city of New-York, were upon the bench of that court at the commencement of a trial, there would be no impropriety in continuing the proceedings before the three remaining judges, provided a case of sickness, or his official duties elsewhere, rendered it necessary or expedient that the chief justice should leave the court before the conclusion of the trial. In this court, and even in the present case, some of its members who were here at the commencement of the argument, left the court *before the argument was concluded; and　　[ *530 ] yet no one can doubt as to the right of the other members, who remained and heard the whole argument and constituted a constitutional quorum to decide the cause. The case would also have been the same if the presiding officer of this court had been compelled to leave his seat upon the bench before the conclusion of the argument.

I think the judges, before whom the prisoner was tried, were right in excluding the *memorandum in pencil,* on the back of the inquisition, as legal evidence of what the witness, Wright, testified, or rather of what he was supposed not to have testified, before the coroner on the *ante mortem* inquest held upon the body of the wounded Dennon. This court has, I admit, decided that a note or *memorandum* in writing of a sale of personal property, under the statute of frauds, was sufficient if written in pencil ; and that it was not necessary that it should be written with ink or any other durable substance or liquid. *Clason v. Bailey,* 14 *Johns. R.* 484. I apprehend that case, however, was decided in reference to the particular phraseology of the section of the statute under which the question arose, which used the words, *note or memorandum* of the agreement ;" and that it was not intended to lay down a general principle that where a statute required a judicial proceeding, or a will, or a declaration of trust, &c. to be in writing, it would be a sufficient compliance with the statute, if the record or other legal instrument was drawn up and authenticated with a lead pencil merely. Indeed, the late Chancellor Kent, who delivered the opinion of this court in that case, puts the decision upon the words *note or memorandum* there used. He says " the statute of frauds, in respect to such contracts as the one before us, did not require any formal and solemn instrument. It only required *a note or memorandum,* which imports an informal writing done on the spot, in the moment, and hurry, and tumult of commercial business. A lead pencil is generally the most accessible and convenient instrument of writing on

such occasions, and I see no good reason why we should wish to

[ *531 ] put an interdict on all *memoranda* written with a pencil.   I *am persuaded it would be attended with much inconvenience and afford more opportunities and temptation to parties to break faith with each other than by allowing the writing with a pencil to stand." The court of king's bench in England, in a more recent case, has also decided that an endorsement of a promissory note written with a pencil was a valid endorsement, within the custom of merchants, at common law.   *Geary* v. *Physic*, 5 *Barn. & Cress. R.* 234.   There is certainly great danger in leaving the evidence of a contract to depend upon a mere pencil memorandum ; as the contract is frequently drawn in such a manner that by rubbing out a single word, the agreememt might be entirely different from that which was made by the parties thereto ; and yet if an entire clause thus obliterated happened to have been at the commencement of the agreement, the fraud might be perpetrated without the power of detection.   But if parties are so unwise as to make their agreements in that way, I do not know that it is the business of courts in all cases to endeavor to protect them against the probable consequences of their folly, by requiring such commercial contracts to be written with more enduring materials.   I do not, therefore, feel disposed to find fault with the decision of this court so far as the principle involved therein is confined to the class of cases which was contemplated by the court, when that decision was made.   The general interests of society, however, require that the principle should not be extended to deeds and wills, and other solemn instruments ; although these are also the acts of the parties whose rights or testamentary wishes alone would be affected by an obliteration, whether intentional or accidental, of a part of the instrument.   And certainly the principle can never, with any propriety, be applied to the official acts of public officers, or of courts, whose proceedings are required to be in writing, either by statute or according to the requisitions of the common law. They are not to be permitted to jeopard the rights of individuals, or the interests of the public, by departing from the practice which has been pursued

for centuries ; not only of writing their official acts and proceed-

[ *532 ] ings *but *upon* some enduring material, as paper or parchment, also *with* materials which will be likely to last.   I believe the uniform practice has been, since the beginning of the reign of Richard the first, when the first regular series of records in England commences, to write every thing which was to be placed on record in that manner.   And certainly no reason can exist for departing from that practice at the present day, when the ordinary writing materials have become so common that they are or at least ought to be in the house if not in the pocket of every one who is authorized to draw legal instruments, or to transact any official business.   In this case it would have been just as easy for the coroner to have drawn up

and certified the depositions of the witnesses with a pen and ink as it was to draw up and sign the inquisition itself in that manner. The statute requires the testimony of all witnesses examined before the coroner's jury to be reduced to writing by the coroner, and to be returned to the next court, with the inquisition ; and when so returned the legislature evidently intended that such examinations should become a part of the public records of the county for the purposes of future reference. The meaning of the law, therefore, was that the depositions of the witnesses should be reduced to writing in the ordinary manner in which legal proceedings are reduced to writing when they are to be preserved as matters of record. And the writing them down in pencil was no more a compliance with the statute than if the coroner had written them with chalk upon a board and deposited that in the clerk's office, with the inquisition.

Again ; the memorandum in pencil was not signed by the coroner, and there was nothing upon the paper to show that these were the depositions of witnesses sworn and examined before the jury upon the taking of the inquisition, or that they were in his hand-writing. It was not intended that the depositions of witnesses and the recognizances should form a part of the inquisition itself ; but only that the coroner should return them with, or at the same time when he returned the inquisition. He had an undoubted right to place the written examinations of the witnesses *on [ *533 ] the back of the inquisition, or to annex them to the same ; but still he should have certified that they were the depositions. of the witnesses examined before the jury upon the taking of that inquisition. If he had done so, and signed his name to the same, the court might probably have presumed that the witnesses were sworn.

The statute does not make these examinations before the coroner *evidence*, either for or against the party charged with having killed or wounded the person upon whose body the inquisition is held. But if any witness thus examined is called and sworn as a witness in any other suit or proceeding, it is undoubtedly competent for the party against whom he is called to give his former examination in evidence to impeach his testimony, by showing that he gave a different account of the transaction when sworn upon the coroner's inquest. It was with that view, as I understand the case, that the examination of Wright, upon the inquisition held upon the body of Dennon, who was wounded, but not killed, in the same affray, was offered in evidence here. The prisoner, however, had lost no legal right by the neglect of the coroner to take down and certify the examinations of the witnesses on that inquisition, according to the statute ; for as that had not been done, it was perfectly competent for the prisoner to call the coroner, or any other person who was present at the taking of the deposition, for the purpose of proving

that Wright gave a different account of the affray then, from what he did on the trial, if such was the fact.

The next objection relates to the form of the indictment and the supposed error of the presiding judge, in telling the jury that they were authorized to find the prisoner guilty under the first count of the indictment, if they believed him guilty of murder, either from a premeditated design to effect the death of the person killed or of any human being, or by an act imminently dangerous to others, and evincing a depraved mind regardless of human life, as in either case the crime fell within the common law definition of killing with malice aforethought. The correctness of this part of the charge depends upon the question whether the first count *of the indictment was a good indictment for murder at the common law, so as to authorize a conviction under it if the jury believe the prisoner guilty of the crime of murder, as defined either in the first or second subdivision of the fifth section of the title of the revised statutes relative to crimes punishable with death. 2 R. S. 657.

[ *534 ]

Why the presiding judge should have told the jury to exclude the second count of the indictment entirely from their consideration, I cannot understand ; for if he was right in supposing that the first count was good as a common law count for murder with *malice aforethought*, notwithstanding the insertion therein of the additional words, *and from a premeditated design to effect the death of him the said Peter Fitzpatrick*, the second count was equally good as a common law indictment for murder, although it contained the additional words, *and by an act imminently dangerous to the said Fitzpatrick, and evincing a depraved mind regardless of human life*. The prisoner, therefore, if guilty of murder, might have been found guilty under the second count as well as the first. The result of the conviction being the same also in every respect, whether he was found guilty under both counts or under one of them only, there was no reason for telling the jury to confine themselves to either count particularly, as they would be authorized to find a general verdict. The error in this respect, which was an error in favor of the prisoner rather than to his prejudice, probably arose from another mistake in this part of the charge, which was also in favor of the prisoner, in telling the jury that the legal construction of the second subdivision of the section defining the crime of murder was, that the killing must be perpetrated by an act imminently dangerous to *other persons* as well as to the one killed. In this construction of the second subdivision, the presiding judge was clearly wrong. The word *others*, there means others than the persons by whom the act of killing is perpetrated. Although the plural, *others*, is there used, it is not necessary that the act should be imminently dangerous to more than a single individual, and that individual may be the

person killed, as was charged in the second count of this indict-
ment ; for wherever a plural word is thus used, *the eleventh sec-    [ *535 ]
tion of the act concerning the revised statutes declares it shall be
deemed to include the singular also, and *vice versa*, unless it be otherwise
specially provided, or unless there is something in the subject or context re-
pugnant to such construction. 2 *R. S.* 778. The true construction of the
second subdivision, therefore, is the same as if it was written thus : " When
perpetrated by an act, or by several acts imminently dangerous to others, or
to another than the person or persons perpetrating such act or acts ; and
evincing a depraved mind or depraved minds," &c.

Admitting, then, that the counsel for the prisoner were right in supposing
that the additional words in these two counts of the indictment restricted the
first count to a killing with *a premeditated design*, as defined in the first sub-
division, and the second count to killing by *an act imminently dangerous to
others*, &c. as defined in the second subdivision, the prisoner could not have
been injured by this part of the charge, although the jurors were in effect
told that if they believed him guilty of the offence charged in the second
count of the indictment, they should not find a verdict against him on that
count, but on the first only. The jury being judges both of the law and the
fact, and having come to the conclusion that the defendant was guilty of the
murder as charged, either in the one or the other of these counts, or in both,
have applied the law and the facts of the case to the two counts of the in-
dictment better than the judge did in his charge ; and have found a general
verdict upon both counts against the prisoner. And I do not see that this
court has any legal power to reverse the judgment if the verdict was right
as to the second count, even if we should be of the opinion that the judge
ought to have told the jury that the prisoner could not be legally convicted
under the first count of the indictment, unless they were satisfied from the
evidence that there was a premeditated design on his part to take the life of
the person killed.

I have also arrived at the conclusion that the supreme court was right in
supposing that this was a good common law indictment for murder, with mal-
ice aforethought ; and that the additional allegation in each count
may be rejected *as surplusage. The cases in which the addition    [ *536 ]
of an allegation not required by law to be stated in the indict-
ment renders it necessary to prove such allegation, are those in which the
allegation identifies the offence charged ; and where, if the prisoner was
acquitted in consequence of that misdescription of the offence, he could be
again indicted and tried for the offence intended to be charged in the first
indictment. Thus, in the case of *The Queen* v. *Dean and another*, as found
in 4 *London Jurist*, 364 the prisoners were indicted for a conspiracy in pro-
curing certain affidavits to be filed in the court of chancery to obtain money

from that court improperly. Upon the common law principles of indictments for conspiracy, as settled in England, it probably would have been sufficient to have charged in general terms that there were certain moneys in the court, without specifying who was the owner thereof, and that the prisoners conspired together to deceive the court, and pervert the course of justice, by filing false affidavits, to show the money belonged to a person who was not in truth entitled to it, and that they procured the false affidavits to be filed for that purpose ; and then to have given the facts in evidence to support this general allegation upon the trial of the indictment. But in that case, instead of doing so, the prosecutor stated in the indictment, after setting out a certain will, that there were moneys in the court of chancery to which *L. Gompertz* had become entitled under that will, and that the defendants procured the false affidavits to be filed for the purpose of getting those moneys, with intent to defraud Gompertz ; with the additional allegation that they intended to deceive the court of chancery and pervert the course of justice. Upon the trial, it appearing that the money which the defendants were seeking to obtain, was not the money of Gompertz, as alleged in the indictment, the court held that the allegation that the affidavits were filed to obtain money belonging to *Gompertz*, and to defraud him, went to the *identity* of the offence and was not mere surplusage.

It is also a general rule in indictments, that every fact or circumstance which is a necessary ingredient to constitute the offence, or which is material to its identity, must be correctly set out, and must be prov-

[ *537 ] ed substantially as charged ; *but that any fact or circumstance which is not a necessary ingredient in the offence, and which is not material to its identity, if set out in the indictment may be rejected as surplusage on the trial. Thus, in the *King* v. *Jones*, 2 *Barn. & Adol.* 611, in an indictment against a surgeon for giving a certificate relative to an insane person, without having visited and personally examined the individual to whom it related, contrary to the statute, the indictment charged that the defendant, *knowingly*, and *with intent to deceive*, signed the certificate set forth in the indictment without having visited and personally examined the individual to whom it related ; the court held that the allegation that the certificate was signed *with the intent charged* in the indictment, was mere surplusage, and must be rejected. Judgment was therefore given against the defendant, although the jury negatived any such intent. *See the United States* v. *Howard*, 3 *Sumner's R.* 12. So in the ordinary case of burglary, where the indictment charges that the prisoner broke and entered the dwelling house with intention to steal, and did then and there steal certain goods, &c. being in such house, the allegation of the additional circumstance of stealing the goods may be rejected as surplusage, if the jury are satisfied that the prisoner intended to steal ; although if the fact of stealing had been

proved it would of itself have furnished conclusive evidence of the prisoner's intent.   But if this allegation was not proved, other evidence might be produced to prove his intention to steal.   So also, in the case under consideration, the indictment having charged the murder to have been committed with *malice aforethought,* which embraced every definition of murder, it authorized the conviction of the prisoner upon that count, upon proof bringing the case within either of the statutory definitions of murder with malice aforethought.   The public prosecutor, therefore, was not precluded from giving such evidence, although the indictment stated one other circumstance, which, if proved, would have itself established the allegation that the killing of the deceased was with malice aforethought, in the legal sense in which that expression was used in the indictment.

*I see nothing exceptionable in the remark of the judge that   [ *538 ] there was an absence of any testimony on the part of the prisoner of former good character.   It was the mere statement of a fact in the case which almost necessarily followed the correct legal position which the judge had just laid down : that in doubtful cases, when the scales of justice are nicely poised, evidence of a good character and of a virtuous life has great weight in turning the balance in favor of the prisoner.   The meaning of this part of the charge is not that where the probabilities of the prisoner's guilt or innocence are equal, testimony of character is of importance ; but when the scales of justice are nicely poised, that is, when the minds of the jury are nearly balanced upon the question whether the testimony against the prisoner is not too strong to admit of a reasonable doubt of his guilt, then evidence on his part that he has up to the period of the alleged crime, sustained a character which is wholly inconsistent with what is then charged against him, is entitled to great weight in turning the balance in his favor, by creating a doubt in the minds of the jury whether he has thus suddenly departed from that blameless course of life which he had previously pursued.   The remark too was properly made in reference to the evidence in this case.   The testimony showed that the life of a citizen had been taken, under circumstances of great aggravation, by some one of the lawless associates who had so improperly intruded themselves into the house where the deceased and his friends were assembled, and that the prisoner was probably the one who committed the murder.   In summing up a cause to the jury, even in a capital case the judge has no right to point out to the jurors the strong points in the prisoner's defence only, and the weak points in the case made by the people.   It is his duty to hold the scales of justice equally balanced between the people and the prisoner ; and to point out to the jury impartially the strong and the weak points in the case of each, whether arising from the evidence given, or from the want of evidence which might have been given by either, if any such evidence existed.   The bill of exceptions does not profess to contain

[ *539 ] the whole *charge, but only such points of it as the prisoner's counsel deemed objectionable. We have no right, therefore, to presume that the presiding judge, in a capital case, so far neglected his duty as to omit to tell the jury, what is usual in every criminal case which can admit of any doubt, that if they had any reasonable doubt as to the guilt of the prisoner, it was their duty to acquit.

The objections to the organization of the court at the commencement of the trial, and to the jurisdiction and authority of all or any of the officers before whom the trial was subsequently proceeded in, to hold or sit in a court of oyer and terminer, I will now proceed to consider. The objection that *aldermen*, who are elective officers, and not appointed by the governor and senate, cannot be constitutionally authorized by the legislature to exercise judicial powers, as the *ex officio* judges of any court, I have fully considered in another case, upon the information filed by the attorney general against the present mayor and aldermen of the city of New-York, and have arrived at the conclusion that the objection is untenable. But as other members of the court may differ with me in opinion on that question, it may be proper that I should express an opinion as to the legal effect of such a construction of the constitution as is contended for by the counsel for the plaintiff in error in the present case.

Upon a full examination of the question, I am satisfied that the principle, that the official acts of officers *de facto* are valid as between third persons, cannot properly be applied to an unconstitutional exercise of power by an officer *de jure*, who claims to exercise that power by virtue of such office. An officer *de facto* is one who comes into a legal and constitutional office *by color* of a legal appointment or election to that office ; and as the duties of the office must be discharged by some one, for the benefit of the public, the law does not require third persons, at their peril, to ascertain whether such officer has been properly elected or appointed, before they submit themselves to his authority, or call upon him to perform official acts which it is necessary should be performed. Thus, for instance, the [ *540 ] constitution *requires that the justices of the supreme court shall be appointed by the governor, with the advice and consent of the senate ; but if, either intentionally or from inadvertence, the governor should appoint and commission an individual as one of the justices of that court, without having previously nominated him to the senate and obtained the consent of that body, and the person thus appointed should take upon himself the duties of that office, he would be a judge of the supreme court *de facto ;* although upon a *quo warranto* he might be removed from the office to which he had not been legally and constitutionally appointed ; and his official acts while he was such judge *de facto*, would be valid as to third persons ; so that this court, upon a writ of error brought for the purpose of reversing

a judgment pronounced by him, as such judge *de facto* of that court, would not be authorized to enquire as to the validity of his appointment. The result would be the same where his appointment had been made with the consent of the senate, in case he was constitutionally *ineligible* in consequence of his being a minister of the gospel. Should the executive or the legislature, however, either by a public statute or otherwise, assign the duties of judges of the supreme court to the several *clergymen* of a city for the time being, or attempt to authorize them, by virtue of their clerical offices, to be judges and to hold the supreme court, in violation of the constitution, such clergymen would not be judges of that court *de facto*, so as to make their judgments valid or binding upon the parties thereto. On the contrary, the holding of the court by such clergymen would be the exercise of an illegal and unconstitutional power ; and if it appeared upon the face of the record that the court was held before them as clergymen of such city, as it appears in the present case that the court of oyer and terminer was held before *Benson* and *Purdy* in their characters of *aldermen* merely, the judgment would be clearly erroneous, if not absolutely void. This distinction between the acts of an officer *de facto* exercising the powers which legally and constitutionally belong to the office into which he has obtruded himself, and the acts of an officer *de jure* which he cannot legally or constitutionally exercise *by virtue of the office he rightfully holds, will be [ *541 ] seen to a certain extent in the cases of *McInstry* v. *Tanner*, 9 *Johns. R.* 134, and of *Clayton* v. *Per Dun*, 13 *id.* 218, in our own supreme court. In the first case, the justice of the peace was an officer *de facto*, and by virtue of that office had power to hold the court before which the cause was tried ; although he was not rightfully appointed to the office, because as a *minister of the gospel* he was constitutionally ineligible. There the supreme court held the judgment valid as between the parties thereto, and that it could not be reversed on a certiorari. In the second case the justice was legally and rightfully appointed to the office, and was therefore an officer *de jure*, but had not the legal right to exercise the judicial power which he assumed to exercise by virtue of that office, because he kept a *tavern ;* and there the supreme court reversed the judgment, although the justice claimed and exercised the power of holding a court and trying the suit commenced before him by virtue of his office. So in the case under consideration, if the *aldermen*, as elective officers, were *constitutionally incompetent* to hold a court of oyer and terminer in conjunction with the circuit judge, or the first judge of the court of common pleas, then the law which in terms attempted to confer on them such a power, was unconstitutional and void, and it conferred no power whatever ; and if the two aldermen were constitutionally authorized to hold such a court in conjunction with the first judge, yet if the second associate of the common pleas was not authorized by law to preside

in or hold the court of oyer and terminer as a substitute for the first judge, then the continuance of the trial before him and the two aldermen was unauthorized, although they claimed and exercised the right *de facto* to hold a court of oyer and terminer in the absence of the circuit judge. The difference between the official acts of *de facto* judges of a court duly organized, and of the *de facto* officers of an unconstitutional and therefore an illegally organized court, is plainly pointed out by judge Robertson of Kentucky, in the two causes reported by J. J. Marshall, in reference to the official acts of the judges of the new court of appeals; which court was declared unconstitutional. 1 *J. J. Marsh.* 205, 206.

[ *542 ]    *The constitution is the paramount law to which all courts in the exercise of their judicial powers must bow, notwithstanding any legislative enactments to the contrary. It is not necessary in this case to say that the judgments and proceedings before every tribunal illegally constituted, and in direct violation of a constitutional prohibition, are absolutely void; so that the judges of the court, and all those who had attempted to execute the process issued by them, would be liable as trespassers. But in deference to the constitution, which we have all sworn to support, I must declare, as my deliberate opinion, that when the judgment of such a tribunal is properly brought before this court for review, on a writ of error, if the unconstitutional organization of that tribunal fully and distinctly appears upon the record, it is the duty of this court to reverse or annul that judgment. If, therefore, the other members of this court shall have arrived at the conclusion that the aldermen ex officio could not constitutionally execute the judicial duty of a judge of the court of oyer and terminer in the city of New-York, the judgment of death pronounced against the plaintiff in error should be reversed; so that he may be re-tried in a constitutional court of oyer and terminer, whenever the legislature shall provide by law for the organization of such a court in the city of New-York. A new indictment will also be necessary in that case, as I see from the record that this indictment was found at a court in which two out of the three judges thereof sat as aldermen merely.

But if this court should come to the conclusion that aldermen can, in conformity with the principles of the constitution, be *ex officio* judges of a court, it is still necessary to enquire whether the *second associate judge* of the common pleas was authorized by law to preside in the court of oyer and terminer? And if he could do so, then to determine the question whether, under the provisions of the revised statutes, the court was legally organized at the commencement of the trial, when, as appears from the record, *the circuit judge* and *the second associate judge* of the court of common pleas were both on the bench, and acting as judges of the court of oyer and terminer at the same time.

*Upon the first question, I concur, though I confess with some     [ *543 ]
hesitation, in the opinion of the supreme court.   The revised stat-
utes had authorized the *first judge* of the court of common pleas, together
with the mayor, recorder and aldermen of the city of New-York, or with
any two of them, to hold the court of oyer and terminer.   The act of April,
1839, authorized the appointment of an additional associate judge of the
court of common pleas, and declared that the judge so appointed should pos-
sess all the powers then vested by law in the first judge of the said court.
This grant of power is general ; and is neither in terms or by necessary im-
plication confined to the powers which the first judge was authorized to ex-
ercise in the court of common pleas merely.   Indeed, such a restricted con-
struction would have excluded him from acting as one of the judges of the
court of general sessions of the peace.   For by referring to the section of
the revised statutes relative to the general session in New-York, it will be
seen that the power to hold that court was not given to *all* who should there-
after be appointed by law as judges of the court of common pleas, but to the
*first judge* and the mayor and recorder and aldermen merely,   2 *R. S.*
216, § 29.   One of the powers vested by law in the *first judge* was to pre-
side in the court of oyer and terminer with the mayor, recorder and alder-
men, or with any two of them, in the absence of the justices of the supreme
court and circit judges ; and another was to hold the general sessions in con-
nection with the same officers or any two or more of them.   I think, there-
fore, the legislature must have intended to confer both these powers on the
second associate judge, under this broad language in the act of 1839.   '

I have not, however, been able to get over the technical difficulty in this
case in relation to the organization of the court previous to the time when
the circuit judge left the bench, for if a court of oyer and terminer was not
legally organized at that time, the judges before whom the trial commenced
had not jurisdiction to proceed in the trial; and a want of jurisdiction ap-
pearing upon the record of the court below, may be taken ad-
vantage of upon a writ of *error.   I infer from the opinion of     [ *544 ]
the supreme court, that this particular objection was not argued in
that court ; and that it appears for the first time upon the points of the
prisoner's counsel here.   It was an objection, however, which was necessari-
ly presented to that court by the general assignment of errors ; and which,
if urged there, could not have been obviated by the public prosecutor.   As
such, it comes within the exceptions to the decision in the case of *Campbell*
v. *Stakes,* 2 *Wendell,* 146, that this court would not reverse a judgment of
the supreme court upon a question which had never been brought before the
justices of that court for its decision.   *See also Palmer* v. *Lorillard,* 18
*Johns. R.* 343.   I cannot, therefore, refuse to give the prisoner the benefit
of this objection, if valid, although it comes so late.

By the revised laws of 1813, 1 *R. L.* 339, § 15, the justices of the supreme court, or either of them, together with the mayor, recorder, and aldermen of the city of New-York, or any three or more of them, of whom either of the justices of the supreme court should always be one, were authorized to hold the court of oyer and terminer in the city and county of New-York. Under this law, any number of the justices of the supreme court were authorized to be present, either with or without the presence of the mayor, recorder, and aldermen ; provided there were as many as three judges on the bench, and that at least one of the three was a justice of the supreme court ; and the courts of oyer and terminer in the other counties of the state were organized substantially in the same way. The judiciary act of 1823, in organizing the courts under the new constitution, contained a similar provision, authorizing all the judges of the supreme court and other judges who were empowered to hold the circuits in conjunction with the local judges, or any three or more of the whole number, of whom a justice of the supreme court or a circuit judge should always be one, to hold the oyer and terminer. *Statutes of* 1823, 211, § 9. But in the revised statutes, for some reasons not explained in the notes of the revisers, the phraseology of the law was changed so as to permit only one justice of the [ *545 ] *supreme court, or one circuit judge, together with at least two of the local judges in the other counties of the state except New-York, to hold the oyer and terminer ; and the provision in relation to the city and county of New-York is, that the court of oyer and terminer may be held " by one or more of the justices of the supreme court, or of the circuit judges, or by the first judge of the court of common pleas of the said city and county, together with the mayor, recorder, and aldermen of that city, or any two of them." 2 *R. S.* 204, § 28. The effect of this last provision was to authorize one or more of the justices of the supreme court, or one or more of the circuit judges, to sit in the court of oyer and terminer with the mayor, recorder and aldermen, or any two of them, but excluding from the court when thus organized, the first judge of the common pleas, who is only authorised to preside in or be present in the court of oyer and terminer as a judge thereof, when a justice of the supreme court, or a circuit judge does not constitute one of the members of the court. This is the only intelligible construction which I have been able to put upon the language of the statute ; and as the second associate judge of the common pleas has no other powers in relation to the court of oyer and terminer than such as were vested in the first judge, it follows of course that the court which commenced the trial in this case was not legally organized, as it appears by the record that it was held before two persons who were not authorized to hold it *conjointly.* This is unquestionably an objection more of form than of substance, as it is not probable that the rights of the prisoner were really pre-

judiced thereby, though the decision of the court upon any question of law that arose might have been left undecided, if the court were equally divided in opinion. In a case involving the life of a fellow being, I do not feel myself authorized to disregard the legal objection to the organization of the court before which he was tried. I must, therefore, vote for a reversal of the judgment, so that the prisoner may have another trial for his life before a tribunal properly constituted for that purpose.

*By Senator DIXON. The question whether the aldermen of   [ *546 ] the city of New-York have a constitutional authority to sit as judges of the court of oyer and terminer in that city, is not presented by this case. They have the authority of the statutes of the state to do so. They have, without question or molestation, for 18 years executed that right under our present constitution, and for a much longer time under the old one ; and so by public acquiescence they are, and have been for a great length of time, judges *de facto* if not *de jure*, of this court, and also of the courts of common pleas and general sessions of the peace in the city of New-York.

The same may be said of the objection to the associate judge who was a member of the court. If he has not held his seat as long as the aldermen, his tenure of office is at least as plausible and colorable.

Several other exceptions were taken on the trial. Those founded in that part of the charge of the judge in which he withdraws from the considera- • tion of the jury the second count in the indictment, which, to say the least, was best supported by the evidence, and that part of the charge in which the judge defined the import of the first count, and instructed the jury what evidence was proper under it, and in so much of the charge as related to the omission on the part of the prisoner to give evidence of good character, were, in my opinion, well taken, or rather those parts of the charge were, in my opinion, erroneous. But without deciding what influence those exceptions ought to have had on a motion for a new trial, I choose to rest my opinion exclusively on another point.

The court, during a portion of the trial at least, was irregularly constituted. The language of the law organizing the court of oyer and terminer for the city and county of New-York is this : 2 *R. S.* 204, § 28, " Courts of oyer and terminer may be held in the city and county of New-York by one or more of the justices of the supreme court, or of the circuit judges, *or by the first judge of the court of common pleas of the said city and county, together with the mayor, recorder and aldermen or any two of them.*"

Now *granting that the law of 1839, under which judge Inglis   [ *547 ] was appointed, confers upon him the power here granted to the first judge, he may then hold the court with the assistance of the " *mayor, recorder and aldermen or any two of them.*" But we shall look here and

elsewhere in vain for any authority for him to sit in this court associated with a circuit judge. The prisoner claims, as a matter of right, to be tried by a court constituted in all respects according to law. He is entitled to the ben-efit not only of all the talents and learning of such a court, but of their sympathies, and if you please their weaknesses. The court consisting of the associate judge and two aldermen was complete without the circuit judge. His presence was not required by any existing law or rule of practice ; and more, there is no law or rule which authorized it. It was an irregularity, and the prisoner has a right to presume that every influence which such ir-regularity had upon the incidents and result of the trial was against him.

The case shows that the circuit judge did attend and conduct the trial as presiding officer the first two days, and then left the trial to be finished by the associate judge and aldermen. Is it probable that all questions regarding the admissibility of evidence and the conduct of the trial were settled in the same manner as they would have been if the circuit judge had been absent ? It is no answer to say that the chances are equal that the influence of the circuit judge swayed decisions in *favor* of the prisoner. It is enough that it might have been *otherwise*. The prisoner has a right to assume that all questions, as to the admissibility . of evidence, which arose on the trial, and were decided against him during the time when the circuit judge presided would, in his absence, have been decided in his favor, and that such evidence as was offered by him, and was excluded by the direction or influence of the circuit judge would, if it had gone before the jury, have influenced their verdict.

I think the prisoner is entitled to a new trial ; and that the judgment of the supreme court ought to be reversed.

[ *548 ] 'By Senator EDWARDS. Has the prisoner been tried by a court properly constituted and organized, and has he had the benefit of a trial conducted according to the well established rules of law and evidence, are the questions presented by the bill of exceptions for our consideration.

The court consisted at first of the circuit judge, the associate judge and two aldermen ; and after some progress had been made in the trial, the circuit judge abandoned the bench, leaving the cause in charge of the associate judge and two aldermen. When the convention assembled to amend the constitution, it found in existence a court of oyer and terminer, and when it adopted the amended constitution, it contemplated the continuance of such a court ; for it gave to the circuit judges the same powers as were possessed by justices of the supreme court in reference to the courts of oyer and ter-miner ; but it did not direct of what grade or number of judges the court should be composed, with the single exception to which I have alluded. As that was then a new office, it became necessary to declare its powers. The

fair presumption therefore is, that the framers of the constitution intended to leave the formation of this court, with this single exception, as they found it, subject to legislative provisions, both as to the grade and number of officers who should compose it ; not that it should be constituted of the same officers as formerly, for they have no where declared or intimated such an intention, but that it might be as to its formation a subject for legislation, the same under the new constitution as under the old. Had they intended to deny to the legislature this power, it is fair to presume they would have said so in express terms. I am of opinion, therefore, the organization of this court is appropriately a subject of legislation, and was so intended by the framers of the constitution. The legislature in the exercise of their powers have declared by whom these courts may be held, and this is the only legitimate source from whence these courts derive their authority.

In the city and county of New-York, it is provided that courts of oyer and terminer may be held by one or more *of the justices  [ *549 ] of the supreme court, or of the circuit judges, or by the first judge of the court of common pleas of the city and county, together with the mayor, recorder and aldermen of the city, or any two of them. 2 R. S. 204, § 28. The fair construction of this provision of the act is, that one or more of the justices of the supreme court, together with the mayor or recorder and aldermen, or any two of these city officers, or one or more of the circuit judges, with these city officers, or any two of them, or the first judge of the court of common pleas of the city and county of New-York, with these city officers, or any two of them, may hold the court ; but this statute no where provides that these different grades of judges shall or may be united for that purpose. The statute, in authorizing each of these different grades of judges to hold the court with certain city officers, did not, in my view, intend they might all hold it conjointly. It cannot reasonably be imagined that the legislature intended that the three justices. of the supreme court, the eight circuit judges, the first judge and associate judges of the court of common pleas, the mayor and recorder and seventeen aldermen, might all sit at the same to constitute a court of oyer and terminer ; yet such might be the fact if the construction of the statute contended for should prevail. By uniting these different grades of officers, a bench of judges is constituted not contemplated by the statute, and of course forming a different tribunal from what was intended to be created. It appears to me, therefore, the prisoner has not had the benefit of a trial before a court properly organized under the statute. Whether he has been prejudiced by a trial before a tribunal thus constituted or not, is not for us to inquire ; suffice it to say, he has not had the benefit of a trial before a tribunal recognized by the laws of his country for the trial of the crime with which he is charged.

As the organization of this court is the proper subject for legislation, I

have no difficulty in coming to the conclusion that the first judge, or either of the associate judges of the court of common pleas of ,the city and county of New-York, together with the mayor, recorder and alder-[ *550 ] men, or *with any two of these city officers, may properly hold the court under the provisions of the several acts of the legislature giving them that authority, and that their several acts are in all respects valid under the constitution.

Nor in my judgment is the objection raised by the attorney general that the aldermen could not constitute a part of this court tenable. The aldermen, at the time of adopting the constitution, were *ex officio* judges of this court, and in the constitution it is not said of whom the court shall be composed, but it recognizes the existence of such court by declaring the power of the circuit judges. If therefore the legislature was not to provide for the continuance of the court, how was it to exist after the death of these incumbents ? What can preserve and continue the organization of the court but legislative authority ; and had the framers of the constitution designed to have taken from the aldermen that portion of the duties of their office, which requires them to act as judges in certain cases, would they not have said so in express terms, and not left it to be inferred that their office in this respect should be classed among what are denominated *judicial,* and because they were not appointed by the governor and senate for the term of five years, that they were to be divested of all authority to act in any judicial capacity ?

From the view I have taken of this case, it becomes unnecessary for me to consider the point whether any of the officers alluded to were judges *de facto.* In my opinion, the first judge and associate judges are judges *de jure* and the aldermen are judges *ex officio* under the charter of the city and the legislative acts from which they derive their authority ; and as there could be no color or pretence whatever of authority for the different grades of judges to hold this court conjointly, their acts as a court *de facto* cannot be sustained. Nor can it be material whether the circuit judge abandoned the bench or not, so far as it respects the legality of the organization of the court ; it not having been duly organized, and the trial having progressed before him, associated with Judge Inglis, his abandonment could not cure the irregularity in the formation of the court. Had the court [ *551 ] been duly organized, I *would have held it manifestly improper for the presiding judge to abandon his seat during the progress of the trial, and more especially so, when the abandonment was objected to on the trial.

Ought the memorandum endorsed in pencil on the coroner's inquest, to have been received in evidence ? The statute provides that " the *testimony* of all witnesses examined before the coroner's jury, shall be reduced to wri-

ting by the coroner, and shall be returned by him together with the inquisition of the jury." 2 *R. S.* 743, § 8. The return of the coroner ought at least to show that what he has returned was *testimony* taken on the inquest. The principle that every officer is presumed to do his duty, is not sufficient to convert a mere memorandum either in pencil or in ink into legal testimony. What is testimony? It is evidence, the statement of a witness under oath or affirmation. 2 *Bouv. L. Dict.* 436. To entitle it to be read in a court of justice, it must have the characteristics of testimony, or they must be supplied *aliunde*. In this case there was neither. It did not purport to be the statement of Wright under oath or affirmation, and there was no certificate or even statement of the coroner that it was such, or that it was testimony, or was turned as such, nor was the coroner or any witness called to show that it was testimony taken on the inquest; but the counsel for the prisoner rested wholly upon the statute requiring the coroner to take the testimony, reduce it to writing and return it, and upon the presumption that, the coroner had done his duty, when even the return itself shewed that he had executed it in an imperfect manner. Under these circumstances, I am inclined to believe the judge was right in rejecting the memorandum as testimony for any purpose whatever. Our statute is not very precise as to the manner in which the testimony shall be taken and returned ; but it requires the *testimony* to be taken and returned, and in order to entitle it to be read on the trial, it must in some way be shown to be the testimony taken on the inquest, or the court is not bound to regard it as such. By the English statute, 7 *Geo.* 4 *ch.* 64, § 4, the coroner is required to put in writing the evidence given to the jury *before him, or as much thereof as [ *552 ] shall be material, and to certify and subscribe the same, and also the inquisition taken—yet it appears with all this precision, the deposition of the witness is not permitted to be read in the English courts, without proving that it is the same as sworn to before the coroner, without any addition or alteration. 1 *Phil. Ev. Cowen & Hill's Notes*, 372. But besides this informality, it does not appear the inquest was taken even in the same cause. It was taken on the view of the body of Edward Dennon, and not on the body of Fitzpatrick, for the murder of whom the prisoner was on trial. This, however, would not have prevented it from being read to affect the credibility of the witness, but still for that purpose it was necessary to show it was his testimony. Whatever view, therefore, I can take of this memorandum, I am of the opinion the judge was right in excluding it as testimony.

The next subject which claims our attention is the charge of the judge to the jury, giving his construction upon the counts in the indictment. Although I have considered this part of the case with all the attention its im-

portance requires, I cannot coincide in the views of the judge.  He says the first count was sufficient to comprehend any of the grades or classes of murder embraced in the first and second subdivisions of the fifth section of the act defining murder, 2 *R. S.* 657, and that if the jury should be of the opinion that the killing of Fitzpatrick by the prisoner, took place either from *premeditated design* to effect the death of the person killed or of any human being, or that it was *perpetrated by an act imminently dangerous* to others, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual, that in either case the crime fell within the common law definition of *malice aforethought ;* and if the facts so warranted, it would be their duty, under the first count of the indictment, to convict the prisoner.  I concede that there is no very material distinction in the meaning of the expression in our statute, *premeditated design* and *malice aforethought,* and that an indictment making use of either might be good at common law ; and that [ *553 ]    *the conclusion of the counts, *against the form of the statute,* &c. may be struck out, and the indictment still be good at common law, though drawn under the statute. 1 *Chit. Cr. Law,* 101.  But that does not remove the difficulty.  The first count in the indictment would still be a special count at the common law, and to convict under it the testimony should square with the facts averred—unless you can strike out a portion of them as surplusage, and make a special count a general count, and convict under it as such.  The first count charges " that the said Ezra White, him the said Peter Fitzpatrick, in manner and form aforesaid, feloniously, wilfully, and of his malice aforethought, and from a premeditated design to effect the death of him the said Fitzpatrick, did kill and murder," &c.  Now having averred in this count that the crime was committed with *a premeditated design to effect the death of Fitzpatrick,* are we at liberty to regard this averment as surplusage, and consider the count as though no such averment was made ?  To constitute a good general count at common law, it was unnecessary that averment should have been made ; but having been made, does it not become material ?  To test the materiality of this averment when once made, let us suppose, as the judge instructed the jury, that the second count in the indictment was disregarded, and the trial was only upon the first count, how would the prisoner prepare himself for trial ?  He would come prepared to rebut all testimony that went to show he had *a premeditated design* to effect the death of Fitzpatrick, but he might not be prepared to shew that a gang of robbers had conspired against him and that he had armed himself in self defence, and while in the act of defending himself and property, had *accidentally* killed Fitzpatrick, who had no hand in the conspiracy and against whom he had no design.  The second count in this indictment was well drawn to apprise the prisoner fully of the crime charged

against him, and why it was the judge charged the jury to disregard it, it is difficult to conceive. This count well conformed with the great fundamental rule for drawing indictments, viz. " the facts must be so set forth on the record that the defendant may clearly understand the *charge    [ *554 ] he is called upon to answer, that the court may know what judgment is to be pronounced on conviction, and that posterity may know what law is to be derived from the record. 1 *Chit. Crim. Law*, 190. This count fully apprised the prisoner of the charge he was called upon to answer, as presented by the testimony on the part of the prosecution. But in order to convict under the *first count*, it appears to me the district attorney was bound to prove a *premeditated design* on the part of the prisoner to murder Fitzpatrick, he having so charged; and this being the foundation of his charge to constitute the crime. In the case of *The United States* v. *Porter*, 3 *Day's R.* 284, Judge Livingston says the court will be more strict in requiring proof of the matters alleged in a criminal than in a civil case. In that case, the defendant was indicted for stopping the mail, and the indictment set out the contract under which the mail was carried, and although he held that the indictment might be so framed as not to require proof of the contract, yet as it stated a contract which was not impertinent or foreign to the cause, he was clearly of the opinion it should be proved. *See also Roscoe's Crim. Ev.* 77; 9 *Yerg. R.* 377: also *Regina* v. *Dean*, 4 *Lond. Jurist*, 364. From the view I have taken of this part of the case, therefore, I am of the opinion the judge erred in charging the jury that it would be their duty to convict under the first count, and instructing them that they should exclude entirely from their consideration the second count of the indictment.

Nor am I satisfied with that portion of the judge's charge which relates to the general character of the prisoner. I think the case was one that did not call for such remarks, and that they were calculated to prejudice the minds of the jury against him in that respect, and to infringe in some measure upon the great and fundamental principle which presumes a man innocent until the contrary appears. I am aware the supreme court have gone great lengths in presuming bad character, where the contrary does not appear in certain cases. But they have not gone so far in any case as the judge did in the case under review. *He probably relied    [ *555 ] principally on *The People* v. *Vane*, 12 *Wendell*, 78, in which the court held that " evidence of the good character of the defendant on the trial of an indictment is always admissible, though it cannot avail when the evidence against him is positive and unimpeached; but where the evidence is circumstantial, or comes from a suspected or impeached witness, proof of good character is important. A man is not to be convicted because he has a bad character or no character; but in a case like the pres-

ent, character becomes important, and where no such evidence is produced, the presumption is it cannot be produced, and the further inference is, the defendant is a man of bad character, and would naturally be associated with such men as the witness." That was a case where the principal testimony came from a suspected witness. It was a case of grand larceny for stealing a package of bank bills, and the principal witness was an accomplice, and disclosed his participation in the crime. The case under review is not one where the evidence is circumstantial, or comes from a suspected or impeached witness. It would not be competent for the prosecution to give evidence of the bad character of the prisoner, when no evidence in support of his character had been adduced by him. *The People* v. *White*, 14 *Wendell*, 111. *Commonwealth* v. *Hardy*, 2 *Mass. R.* 317, *note* 341 *to p.* 177. No inference, therefore, ought to be drawn to substantiate a fact the prosecutor could not be permitted to prove. The principle which admits of such testimony in cases of doubt where the evidence to convict is circumstantial, or comes from a suspected or impeached witness, is designed for the benefit of the prisoner, and intended to aid him against a wrongful conviction, and not to prejudice his defence, as may have been the effect in the present instance. I am for reversing the judgment of the supreme court, and granting a new trial.

By Senator FURMAN. In almost innumerable cases, and for a long period of time, it has been held that presumptions against the life of a prisoner should not be indulged to *produce his conviction ; but on the contrary, should work to his benefit. We are, therefore, not at liberty to presume that the judge was required by sickness to leave the bench during the progress of the trial, unless it appears distinctly upon the face of the record. There was indeed no intentional violation of duty on the part of the judge, and neither are we bound to regard his departure in that light, in order to give the benefit of this objection to the prisoner. So also we are not permitted to presame that when a new judge came to preside in that trial, he knew all the previous rulings and decisions of the court, all the testimony which had been previously given, with its bearings.

In my judgment the court below erred in excluding the coroner's record of the testimony of Wright, the witness, to contradict him ; because Wright himself had previously testified that he was examined as a witness before the coroner on the inquest *ante mortem* of Edward Dennon, and it was to contradict what he had said in relation to that matter, that this record was sought to be offered. It was found in the place, where such a record should be kept, and written upon the back of an inquisition regularly executed by the coroner and his jury, and by the coroner filed in the county clerk's office as required by statute. It thus being produced, if it was not a record with all the presumptions in its favor, such should have been shewn on the part of

the people by the district attorney. It was also urged that this cannot be a record because it is written *in pencil*. It has, however, been held a compliance with law that depositions are in pencil ; that memoranda of agreements between parties are in pencil ; and that endorsements upon promissory notes are written with pencils. And the statute, in this case, does not require that these depositions be in writing *with ink*. And further upon the circumstances attending such proceedings, it does seem to me to be a good and sufficient record ; the coroner's inquest is not in any case made up and signed by that officer and his jury until after the testimony is taken and completed, which is frequently taken in the open air, or under the most disadvantageous circumstances. After this examination of *witnesses  [ *557 ]  the coroner, with the jury, retire to some convenient place where they make up their inquisition ; which accounts for the depositions being in pencil mark, and the inquisition itself in writing. Besides the law will presume that the coroner, as a public officer, has done what the statute requires of him. It has been intimated that if such a record could be received *in favor* of a prisoner's life, and not be hereafter held to authorize its introduction *against* him, to warrant his conviction, it might be received in favor of the defence in this case. Under no circumstances, even if such matter had been in writing, and a good record, has it been held by any authority recognized as law that it might be offered or given in evidence *against* the prisoner, if the witness who made such deposition was alive ; and it is now held by more modern authorities that it could not be given in evidence against the prisoner under any circumstances, thus obviating the only real objection, beyond its not being in ink, which has been made against the introduction of this record in favor of the defence. That such testimony of the record if admitted would have been immaterial, and not have operated in favor of the prisoner's defence, is what the court have no legal authority to determine, and especially so in a capital case. The prisoner's counsel only have the right to judge of the effect of such evidence when given to the jury ; and to hold any other and different rule will be to interfere with the province of the jury, provided always such testimony be pertinent and legal.

On the subject of the instruction of the presiding judge to the jury on the frame of the indictment, I think there is a material error. The first count of the indictment is limited to that particular description of murder mentioned in the first subdivision of the statute. To appreciate the importance of this objection it is necessary for a moment to advert to the description of the various grades of homicide recognized by law. Every one who takes the life of another commits *homicide :* 1. It is justifiable or excusable, and therefore no offence at law ; 2. it is felonious, and is then either murder or manslaughter. If done without malice *express, or implied,   [ *558 ]

it is manslaughter; and if done with malice express, or implied, it is murder.

The indictment does not charge that the prisoner had killed the deceased with malice express or implied. But charges that the crime was committed with a *premeditated design* to kill Peter Fitzpatrick. These words *premeditated design*, as used by the statute, limit the signification of malice aforethought, to *express malice*. And the words in the first count of the indictment are a description of the particular species of crime with which the prisoner is sought to be charged, and against which he is called upon to defend himself. The statute shows by its phraseology that the legislature designed to describe different grades of malice. So if the public prosecutor gives a particular description of a crime, it has been held he must prove it as he lays it; although in some instances it was not necessary to allege the offence in that particular manner; so choice have all the courts been of the life and liberty of citizens, and thus in 1 *Moody's Crown Cases*, 303, where an indictment describes the crime of bigamy as having been committed by the prisoner in marrying, as a second wife, Elizabeth Chant, *widow*, when it appeared upon proof that she was a *single woman*, it was held by all the judges, that such a variance was fatal. And upon such variances Lord Ellenborough, in *Campbell's Nisi Prius*, has said that the crime must be proved as charged, for there are ways enough to convict the guilty without breaking down the rules established for the safeguard of the innocent.

It has been held by some that such particularity might be rejected as surplusage. I cannot accede to this doctrine, and believe the court never has a right to reject any thing which is descriptive of the offence. And the instance to which the judge refers, in the opinion of the supreme court, is in favor of life, but, in my judgment, the doctrine which he seeks to sustain upon it will give the court a right to convict of a higher offence on an indictment for a lesser one, and so convict of murder on an indictment [ *559 ] for manslaughter. It is, I think, clear that the *words in this indictment are *descriptive* of the offence, and have no proper analogy with the instances cited in the opinion delivered in the supreme court. The second count of the indictment contained an accurate description of the offence as proved, (if any conviction should have been had,) but this count having been taken from the consideration of the jury, I cannot see how the testimony offered could have been applied to the first count, for there is no testimony which shows any express malice against Fitzpatrick.

It has been said that there is nothing objectionable in the charge of the presiding judge, that " when the scales of justice are nicely poised, the evidence of a good character and virtuous life, had great weight in turning the balance in favor of the prisoner; and that in this case there was an absence of such testimony on the part of the prisoner;" and it has been further

urged, that the whole of the judge's charge is not *here*, and that we are to presume that he also charged the jury, that if they had any reasonable doubt on their minds, they should permit it to weigh in favor of the prisoner. In my judgment, even if we should admit such presumption, (although I must protest against all these presumptions on a capital trial,) it does not do away with the strong objection which exists against it. The most honest and virtuous man in the community might be sacrificed on that rule. Any one of the members of this court some thousand miles from home, among strangers, might be charged with murder, (things full as extraordinary as that have happened,) and although his character might be unspotted, and he be, indeed, noted for his " good character and virtuous life" at home and among his acquaintances, yet upon such a trial for murder, it might be out of his power to produce a single witness to prove such his good standing and reputation; and upon the rule here laid down, he might in a doubtful case, from the want of such testimony, be convicted, although entirely innocent. The judge had no right in his charge to give to the people the benefit of evidence against the good character of the prisoner, which they would not have been allowed to prove by direct testimony. I cannot see from the reading *of this charge of the judge how it could possi- [ *560 ] bly have operated in any other way upon the minds of the jury than to induce the conviction of the prisoner; and that it never could have operated in his favor.

The court are not at liberty to convict a man because he has been vicious; if such be the fact, it should operate as a reason why he should be spared in doubtful cases of life and death, in order that he may repent of his evil life, and obtain a pardon for his offences from that higher tribunal at whose bar we must all sooner or later appear.

I think the court of oyer and terminer as constituted upon the trial of this prisoner, with the union of the assistant judge of the common pleas with the circuit judge, was not organized in the manner provided by statute; although I think that either of those officers have the right to preside in that court. But I cannot recognize the right of questioning in this sideway the constitutional right of the mayor and aldermen of the city of New-York to hold that court, and think that a matter of such importance should only be tried on a plain and direct issue involving that question on a *quo warranto*, and for that reason I prefer not here to examine that point.

There is, however, sufficient in this case to induce in my mind the conclusion, that the judgment of the supreme court should be reversed, and that the prisoner should have the benefit of a new trial.

Senator ROOT said that he was of opinion that the judge at the trial erred in the observations made by him to the jury in respect to *the absence of*

*proof of good character*, because the effect upon the minds of the jurors may have been injurous to the prisoner. A prisoner is *presumed* innocent until his guilt be proved. Nothing, therefore, should be *presumed* against him which may affect him on the question before the jury. He added, that his principal object however in rising, was to enter his protest against any decision in this case upon the question of the organization of the court. The judges at all events were judges *de facto* which was enough to estop the prisoner from raising any question upon that point.

[ *561 ]     *By Senator Verplanck. The first question in this case, as it is presented to this court, is as to the constitutional right of the aldermen of the city of New-York to sit as judges of the court of oyer and terminer ; or in other words, whether the provision of the revised statutes making two at least of the elective city magistrates necessary constituent members of that court in the city and county of New-York, is not repugnant to that section of the constitution, *art.* 4, § 7, which expressly provides, that " all *judicial officers*, except justices of the peace, shall be appointed by the governor and senate " ?

The very serious difficulties which exist as to the question of the constitutional right of the city elective magistrates to act as *ex officio* judges of the county courts apply but partially to the present case. The exception of the constitution (as it now stands, since the last amendment of that section,) is positive as to justices of the peace. The amended article relating to the election and term of office of justices of the peace, refers expressly to the justices of the several *towns* of the state. Those in cities are left to the general regulation of law ; nothing being prescribed in regard to them. They may be either elected or appointed annually or for a longer term. The city charter constituted the aldermen justices of the peace, under the English crown, and the act of the 30th January, 1787, conferred upon them the powers of justices of the peace in this state. This provision remains unrepealed by law, and there is no constitutional disability to prevent aldermen from acting as justices. Now I see no ground for thinking that the legislature might not in its discretion direct the *oyer* and *terminer* to be held by any high *judicial officer*, associated with two justices. Such in point of fact is frequently the composition of that court in England, and I believe in some states of this union. The aldermen of New-York might therefore, I think, as justices, be constitutionally members of this court.

But there is still another ground on which the constitutionality of the revised statutes, in thus composing the city court of oyer and terminer, may be safely placed. The constitution has provided (art. 7, sec. 14),

[ *562 ]     that nothing *contained in this constitution shall *annul* any charter to bodies politic or corporate granted by the king of Great Britain or persons acting under his authority, before October 14, 1775, or

shall affect any such grants or charters since made by the state.   The language of these provisions is general, but it is also guarded and cautious. The colonial charters are not so ratified as to be placed beyond the control of the legislature ; they are merely not annulled by the new constitution, which is also not to effect any subsequent grants or charters.   Now the old colonial city charter provided " that the mayor and aldermen for the time being, shall be justices assigned of oyer and terminer, &c.   The act of February, 1788, without any repeal of this charter provision, also granted to the mayor, recorder and aldermen the authority of commissioners of oyer and terminer, under the state of New-York, with power to hold such courts, in conjunction with a judge of the supreme court ; thus giving effect to the provision of the charter under the new order of things.   All the subsequent legislation in relation to the city courts, left that power unaffected, except only in authorizing some other judicial officer to preside with the aldermen.   The revising legislature, in 1828, finding the *ex officio* right of the aldermen to sit as commissioners of oyer and terminer, which was conferred by the charter, and recognized by subsequent amendatory acts neither annulled by the new constitution nor repealed by any prior law, had a constitutional right in their discretion to make these magistrates necessary members of the court of oyer and terminer for the city, as that court was constituted by the revised statutes.   I find no cause of error here.

II.   I assent to the reasoning of the supreme court, as to the lawful authority of the *associate judge* of the common pleas to sit in the oyer and terminer as a presiding judge, and to the construction they have given to the several statutes relating to the powers and duties of the judges of the N. Y. common pleas.

I think moreover that the fact of the circuit judge quitting the court during the trial, if he had left what without him would be a competent court, all the members of which had *authority to sit, and   [ *563 ] had sat throughout the whole case, though it was irregular, does not necessarily vitiate the verdict.   The sudden illness of a judge in any court composed of several members, or any similar unavoidable necessity, must have often produced the same result, yet the decisions of courts have never been questioned on that ground.   If a court which was competent without the member who left the bench before the case is finished, is left, it can never be *presumed,* that the presence at the beginning and the subsequent absence of one judge, could have affected the decision injuriously to the prisoner.   I say that it cannot be presumed, though there might be a remote possibility that it did so.

But a more serious difficulty arises from the same circumstance, growing out of the doubt whether according to the provisions of the revised statutes respecting the oyer and terminer in the city of New-York, the *associate*

*judge* had any right to sit as a mere associate with the aldermen, or at all, except as the presiding judge holding the court. If he could not sit as an associate while the circuit judge presided, then there was no one competent court sitting throughout the trial, but it was conducted in part by one and in part by another court. The literal construction of the statute would lead to this conclusion, as has been shown by the chancellor, and though it is with great hesitation, yet as it is in favor of human life, and in relation to the organization of a court of criminal jurisdiction, I come to the conclusion that the prisoner is entitled to the advantage of the strictest interpretation of the statute.

III. But supposing the court to have been in any respect irregular or unconstitutional, can its acts be now impeached or set aside, and the conviction before us reversed as *coram non judice?* The supreme court hold that as the aldermen, if not actually rightful judges, holding *de jure*, and constitutionally, yet sit with the legal presumption of right under the express sanction of a law to be presumed constitutional until judicially decided not to be so, they are therefore judges *de facto*—their acts are valid, " and must be obeyed and respected until judgment of ouster is pronounced against *them in the proper proceeding for that purpose."

[ *564 ]

" This is a case," says Judge Bronson, " where officers having apparent authority to do the act, have rendered judgment between the people and the prisoner, and neither party can in this collateral way call in question the title of the judges."

It is unquestionably a well established principle, that the acts of all public officers having the presumptive evidence of title by law, commission, election or otherwise, and the actual possession of office, are valid, as far as they affect the interests of the public or of third parties, and that they cannot be impeached collaterally. Thus, for instance, to take an example suggested by Judge Bronson, the county clerk recently ousted from his office held under color of an election, but illegally; yet the rights aqcuired by individuals under deeds or mortgages recorded by him, or verdicts entered by him, cannot be inquired into on that ground. They are valid and effectual to all intents. This arises from the very necessity of the case. Nothing could be certain or secure if the legal rights immediately depending upon the innumerable acts of public officers affecting private citizens could be shaken by any accidental defect in their election or appointment, or in the rights of those by whom they were elected or appointed to vote or to hold office. When, therefore, those whom the constitution of our political society has constituted the judges in the first instance of such elections or official trusts, have given the proper presumptive evidence of official authority, whether by law, if it be grounded on legislative sanction, or by commission or certificate, as the case may be, as to elective or appointed magistrates or

officers, the actual public officer must for all the ordinary purposes of society, be the rightful officer until those to whom the constitution and the laws have confided the duty and the power to examine his title to office, have decided against him. Nor can I doubt that this principle applies generally to judicial officers as well as to mere ministerial or executive functionaries, since the reason and public necessity of the matter are the same in both instances. Nevertheless I am strongly inclined to the opinion that the principle will not cover a case like this. The rule, wise, *salutary and [ *565 ] necessary, is this : that the validity of acts of public officers shall not be collaterally impeached on the ground that though they are in possession of office, and have entered upon it without usurpation, and under presumptive evidence of title, they are not rightfully so in possession. In the language of the supreme court of Massachusetts, " It is an established principle of law, that the acts of an officer having color of title in the exercise of the ordinary functions of his office, are valid in respect to the rights of third parties, who may be interested in such acts. The adoption of such a rule is necessary to prevent a failure of justice, and the great public mischief which might otherwise be apprehended. 15 *Mass. R.* 135. Yet it has always been expressly held, that any citizen may directly contest the official acts of any such officer, such as he can justify only on the ground of rightful title, whenever those acts bear directly upon the party contesting them, and do not involve those of third persons. Thus in one of the cases cited with approbation by Judge Bronson, in which it was held that the court would not decide in a suit between third persons whether a sheriff was legally in office *de jure*, and not merely *de facto*, Chief Justice Parsons adds : " If an action should be commenced against one claiming to be sheriff, for an act which he does not justify but as sheriff, or if an information should be filed against him, in either case he would be a party." *Fowler* v. *Beebe*, 9 *Mass. R.* 234. Here it will be seen that this great judge puts the direct right of the citizen to contest the acts of any public officer, when they directly affect him and do not implicate the rights of others, upon the same ground as that of the state to inquire officially into his title. So again in our own courts, when the question has been between an officer acting under the authority of a court martial, and a citizen fined by that court, as in the case reported 19 *Johns. R.* 33, there appears to have been no doubt of the authority of the supreme court to look into and decide upon the validity or regularity of the constitution of the military tribunal.

Again ; although when rights are once fairly acquired and vested under the decision of a legal court, that decision cannot [ *566 ] be inquired into on the ground of the court having exceeded its jurisdiction, yet the law has expressly provided a remedy against such overleaping of the limits of jurisdiction for the party, as long as he is still be-

fore the court either civilly or criminally, in a plea to the jurisdiction, which if decided adversely to the party by the court itself, may be carried up to the highest appellate tribunal. If then the jurisdiction of a court legally constituted in itself, can thus be contested for exceeding the bounds of its just authority, why cannot the jurisdiction be contested for a still stronger reason, the legality of the constitution of the court itself?

Nor can I allow that the party in a criminal case, waives or loses his right of contesting the decision of an unconstitutional or otherwise illegal tribu- nal, because he does not do so at the earliest stage of the proceedings in the technical form of a plea to the jurisdiction. Even in civil cases our supreme court has laid down the principle in an express decision to that effect, that " where a court has no jurisdiction originally, it does not acquire it either by consent of the defendant or his confessing judgment." *Caines' R.* 129. Much more should this principle find application in a criminal case where, to use the strong language of Chief Justice Spencer in *The People* v. *M'Kinstry.* 18 *Johns. R.* 232 : " It is a known principle in criminal law and especially where life is in question, to consider the prisoner as standing on all his rights and waiving nothing on the score of irregularity." In a criminal case the whole question of law and fact is involved in the plea of *not guilty.* Every error manifest on the record may in some way or other be brought under the review of the appellate tribunal, and no grosser error can be committed than the intrusion of unconstitutional judges into a court in itself legal. In England it has been expressly decided that " if a sen- tence is passed by a person who had no valid commission to judge the par- ties, it is void and may be altogether set aside without a writ of error," and summarily. *See* 1 *Chit. Cr. Law.* 744, *and authorities there cited.* Also 4 *Black. Comm.* 394. I should be among the last to deny that the past acts of officers *de facto,* ministerial, legislative or judicial cannot

[ *567 ] be indirectly, collaterally or *subsequently called into question so as to disturb past and unquestioned adjudications, or other official acts, or to shake vested rights thus acquired by third persons ; but I cannot extend this rule of peace and security beyond the purposes for which it was established. I cannot apply it to the direct action of the party aggrieved appealing against the authority of an unlawful magistrate, to a higher and appropriate court, and this whilst the case is yet open, *dum adhuc versatur urna,* when no sentence has been passed, no final adjudication had, when no man's rights but his own are in question or can be injuriously affected ; when he invokes the contitutional tribunals of his country not in vengeance or for restitution as to the past, but to interpose the shield of rightful judicial pro- tection against the sword of power wielded by an unlawful hand. I can neither regard as sound law or wise public policy any more than as consist- ent with a republican regard to the rights of private citizens, to hold that

the trial of the question of the constitutional or legal power of any officer or judge should depend solely upon the discretion of the attorney general, and remain unquestioned until he impeaches it in the name of the people, whilst the citizen upon whom such unlawful authority acts immediately, and may bear hardly, has no means of defending himself and appealing from this the greatest of all errors that can occur. If, therefore, in this case the composition of the court be such as would, upon information filed by the attorney general, be pronounced unconstitutional, I cannot doubt but that the same question may be directly brought up in error by the prisoner denying the jurisdiction, whilst his case is still open and undecided.

Thus in respect to the judicial character of the aldermen. I agree with the supreme court that the aldermen, whether constitutionaliy or not, *are* judges of the oyer and terminer— are so *de facto*, their commission being written in the statute book which is to be presumed valid and constitutional throughout until it is otherwise decided as to any provision. I agree, therefore, that their acts as judges cannot be impeached, subsequently, collaterally, or by private suit or criminal proceeding against them as individuals under any *view of their constitutional rights. Beyond [ *568 ] this I must dissent from the doctrine, and must hold that the direct denial of their jurisdiction or authority, before the final adjudication of any case, by the party over whom they claim to exercise jurisdiction, whether it be by plea or exception on any cause of error upon the record, is one of the direct and constitutional modes provided for the protection of private rights against legislative or executive aggression. If, therefore, a majority of this court should differ from me in the views I have taken of the rights *de jure* of the city magistrates, the exception seems well taken, and the trial should be considered as a nullity.

IV. On the question of the error in refusing to admit, as evidence in favor of the prisoner, the informal and uncertified return of evidence filed by the coroner, I concur with the judges. Could it have been received in this case, merely in favor of human life and without introducing a general rule allowing similar evidence, which would ordinarily operate against the accused, and be subject to great abuse, I should have wished to admit it. As it stands, without any attestation of oath or other proper formal authentication to the evidence, and open to any alteration, accidental or intentional, in the various hands through which it may have passed, it seems to me to demand some additional attestation to make it evidence, even for the secondary purpose of impeaching other contradictory statements, for which it was produced. If it was important, the testimony of the coroner himself should have been called to support its genuineness, or in defect of that, some other adequate external proof. But there are yet two other grounds of error assigned, and upon both or either of them, I am clear that the prisoner is entitled to a new trial.

V. The presiding judge in his charge excluded from the consideration of the jury the second count of the indictment, and thus confined their attention to the first count alone, which charged the prisoner with killing and murdering Fitzpatrick " wilfully and of his malice aforethought and from a premeditated design to effect the death of the said Fitzpatrick, against [ *569 ] the form of the statute," &c. Now it is very clear that whether there was evidence to support the charge of general malice aforethought, or the killing by an act imminently dangerous to others, or not, there was no evidence whatever to support the charge of a premeditated design against the individual. All the evidence in this case went either to prove only *manslaughter*, or " the killing without a design to effect death in the heat of passion." 2 *R. S.* 661, § 10, or else that species of murder defined as being " perpetrated by an act imminently dangerous to others, although without any premeditated design to effect the death of any particular person." 2 *R. S.* 657, § 5.

The judge, however, charged that this count was sufficient to comprehend any of the grades or classes of murder set forth in the statute, whilst the supreme court decide that the addition of the charge of premeditated design, as according to the statute, did not vitiate the complete charge of murder at the common law which the count contains independent of the allegation of premeditated design. " You may reject this altogether, and still a murder remains charged in the technical language of the common law." " The averment of premeditation is mere surplusage."

I think otherwise. It seems to me that the court has no right to reject what was thus specifically charged as a substantive description of the particular crime. The distinction of unjustifiable killing with premeditated design, as one of the particular classes falling under the general head of malice aforethought, and quite distinct from malice implied in the killing, in the commission of some act dangerous to human life or otherwise, is an old one, and may be found in all the books of the common law. 1 *Hawkins' P. C.* 189. Accordingly our statute has, in defining and classifying the several species of murder, placed in the first class as distinguished from the others, the killing with premeditated design to effect the death of the person killed. By the count in question, though the general common law offence of killing with malice aforethought is laid, yet the particular nature of the crime is also distinctly and specifically charged, in the words of the statute, and expressly referring to it as " against the form of the statute in such case," &c.

[ *570 ]    'I understand the common law rule to be, that an indictment may be good when the offence is charged in general but intelligible terms sufficient for the description without further allegations ; and that moreover, a count may be divided by the jury, and certain allegations re-

jected if the rest constitute a complete offence ; yet when allegations are made, if they be such as to enter substantially into the description of the crime, so that they cannot be, severed from it without rendering the description applicable to another and different offence, (different in fact if not in nature,) then such allegations must be proved, or the indictment is not sustained. Thus, in the recent case of *The Queen* v. *Dean*, in England, where, in an indictment for a conspiracy, the overt acts were averred to have been done with intent to defraud one *Gompertz*, who was entitled to receive a certain sum of money, and the jury found that *he* was not so entitled ; it was held that the indictment could not be sustained, though a verdict of guilty was found. " Lord DENMAN, C. J. : Suppose I had said to the jury, it is nothing to do with the question whether the intent of the defendant was to deceive Gompertz—the jury might have found the defendant guilty of a conspiracy, but it would not have been the conspiracy laid in this indictment. We are of opinion that all the subsequent allegations are so bound up with the allegation of an intent to defraud the person named, that they cannot be dissevered from it ; and that, it being disproved, there is nothing for them to rest upon ; and both counts are open to this objection.— *Verdict of not guilty to be entered.*"

Now, our revised statutes having set forth a distinct classification and definitions of several kinds of murder, the only count to which the jury's attention is directed, (the other being expressly excluded from their consideration) charges the killing of Fitzpatrick to have been in the manner and according to the description of the first class of murder, " with premeditated design to effect his death." The best text books of criminal law describe an indictment as a brief narrative of the offence charged, which must contain a certain description of the crime and the facts necessary to constitute it. 1 *Chit. C. R. L.* 168. This definition has *been adopted by Chief Justice Savage as the foundation of his    [ *571 ] reason in the *per curiam* opinion in *The People* v. *Gates*, 13 *Wendell*, 317. Can this be called in any sense, a certain description of the crime charged, when it is in fact the description of another crime of the same nature, expressly distinguished from it by statute ? Supposing proof had been offered that Fitzpatrick was accidentally killed whilst the prisoner was in the commission of a burglary, which would be a murder of a very different sort, falling under another description of the statute. Here, then, is an offence quite different from the one charged, for which the prisoner and his counsel would not only be unprepared, but they would have been led to prepare against another and different charge. It would be a surprise upon the prisoner, by which the most innocent might be made a victim, if such evidence could be permitted to support an indictment for premeditated murder. It is looking to the mere letter, not to the intent of the statute or the

meaning and object of the indictment, to hold that you can reject all that is specific and descriptive of a particular crime charged, and thus leaving the general charge of murder, consider it well supported by evidence of a crime expressly·distinguished and otherwise described in the statute, and in itself essentially different ; as on the supposition just made of a burglary, in which the deceased was accidentally killed. To my understanding, the whole statutory description of the crime, as set forth in this indictment, is (according to Lord Denman's rule) bound up together, and cannot be dissevered without making a different statutory offence. It is true, that according to the reason of the thing, as well as the decision of this court in *The People* v. *Enoch*, 13 *Wendell*, 159, a general count charging murder with malice aforethought, and thus apprizing the prisoner of the broad nature of the charge which he must meet, would be sufficient, and would be sustained by evidence of any sort of murder whatsoever, within the statutory definitions. This latitude is allowed to the prosecution in deviation from the usual scrupulous caution of our criminal law, on the ground of absolute necessity. For, as Chancellor Walworth has well *said, in the case just cited, " to require the public prosecutor to aver in *hæc verba* the particular intent, would be productive of great evil. In murders committed in secret, it is often impossible to ascertain the particular design. It is now difficult to convict a secret murder, it would then be impossible." Therefore, the law has been compelled to arm the public prosecutor with the power of charging the felonious intent or malice in the most general terms, when the ends of justice would be frustrated by imposing the necessity of a more precise specification of the statutory characteristics of the crime. But I can find neither reason nor authority for extending the power of the prosecutor beyond this limit. In my view, the reason, and the policy of the law, and the analogy of decisions all show that the charge of a murder of one specific class set forth by its legal characteristics is not sustained by proof of commission of a crime of another distinct class. The same principle that requires proof of such facts or intent averred in the indictment as enter substantially and essentially into the specific crime charged, demands also proof of the specific nature and intent.

[ *572 ] A general description of murder, in its widest and broadest sense, may, indeed, legally, as it does logically, include the specific classes or subdivisions of the crime, but it seems equally illegal and illogical, to maintain that the description of one class or subdivision, can include another crime so charged. What may have been the effect of the rejection of this principle upon the case now before us, I do not conjecture, nor is it at all material. It is the general operation of the law we are to regard ; and in that point of view, I consider the doctrine of rejecting as surplusage any of the material averments of the indictment, as dangerous to the rights of every person accused of any of the graver crimes.

It is true, that under both the common law and our own statutes, a person indicted for a higher offence may be convicted of a lower one of the same nature; as one indicted for murder may be found guilty of manslaughter. But, in the first place, this is an express provision of law, and is not *to be extended beyond its direct exception to the more gene-  [ *573 ] ral rule, that a man cannot be indicted for one crime and convict-ed of another. In the next place, this is not a rejection of any part of the indictment as surplusage. It is passing upon the whole as it stands. For instance, the unlawful and designed killing is found, the premeditation is not found; both averments are passed upon, when a verdict of manslaughter is found.

VI. The last exception is founded on the judge's charging, " that in all doubtful cases, where the scales of justice are nicely poised, the evidence of a good character and a virtuous life had great weight in turning the balance in favor of the prisoner. That in this case, there was an absence of such tes-timony on the side of the prisoner."

Here the consideration of general character was distinctly presented to the jury; and the absence of evidence to show a sober and virtuous life, was sug-gested in such a manner as naturally to lead their minds to the opposite con-clusion; that no such evidence was offered, because none could be given, and that his course of life must, therefore, have been profligate or immoral.

On this head, I think the argument of the prisoner's counsel is irresistible and conclusive. The public prosecutor had no right to introduce evidence of a bad general character against a prisoner. The offence must be proved substantially. The humanity and justice of the law give the prisoner the right of adducing evidence of virtuous character to show the improbability of the charge, but otherwise, the law must hold every man, whether virtuous or vicious in his course of life, to be innocent of any specific crime until he is proved guilty. Accordingly says Chief Justice Parsons, " it is not compe-tent for the prosecutor to go into the inquiry of the defendant's character until he voluntarily puts it in issue." 2 *Mass. R.* 318. See also to the same effect, the opinion of our own supreme court, by Judge Sutherland, 14 *Wendell*, 654. Yet here, the judge gives by mere inference to the absence of evidence of a sober and virtuous life, the weight of direct evidence of cha-racter, which the law would not suffer to be made the ground of convic-tion.

*The rule and practice of our law in relation to evidence of  [ *574 ] character rests on the deepest principles of truth and justice.

The protection of the law is due alike to the righteous and unrighteous. The sun of justice shines alike " for the evil and the good, the just and the unjust." Crime must be proved, not presumed; on the contrary, the most vicious is presumed innocent until proved guilty. The admission of a con-

trary rule, even in any degree, would open a door not only to direct oppres-
sion of those who are vicious because they are ignorant and weak, but even
to the operation of prejudices as to religion, politics, character, profession,
manners, upon the minds of honest and well-intentioned jurors.

Take the very case of the unfortunate young man before us.  Suppose
the public prosecutor had been permitted to show, as possibly he might have
been able to do—(and I am taking the worst supposition against the pri-
soner that any facts before us authorize us to make, and it is still but a
supposition,)—supposing the public prosecutor had shown that the prisoner,
though without any impeachment of gross crime, had led a careless and dis-
solute life even beyond the ordinary license which might be pardoned to the
levity of youth—the fault of defective education, and the absence of parental
restraint.  What would be the effect of such evidence ?  Probably to excite
in the minds of some judge or juror prepossessions against the prisoner, and
to induce them to give the greatest weight to all the testimony adverse to
him.  Yet to those who know or who feel how mysteriously virtue is mixed
with vice in human nature—how much of evil there is in the good, and how
much of better feeling is often left in the profligate, what does calm and
sound reason infer from such testimony as to any malignity of heart capable
of deliberate premeditated murder on slight provocation ?  I think it should
have no such weight or tendency at all, even when such proof of character
was presented in its most direct form.  Can it be permitted then to have
such weight when used inferentially and in fact conjecturally—I am confi-
dent that it ought not to be so permitted.

[ *575 ]          *" In all doubtful cases," to use the language of the charge,
" where the scales of justice are nicely poised," the right legal
presumption is in favor of the prisoner's innocence ; and that presumption
should not be permitted to be disturbed by any inference whatever from the
absence " of testimony to prove good character and virtuous life."

The principles I have stated and reasoned from are well supported by au-
thority, see *Commonwealth* v. *Hardy*, 2 *Mass. R.* 310 ; *The People* v.
*White*, 14 *Wendell*, 111 ; *Buller's N. P.* 296 ; *Chitty's Cr. Law*, 574,
5, in spite of an adjudged case or two to the contrary, as *The People* v.
*Vance*, 12 *Wendell*, 78, in our own supreme court some years ago.  If
those cases are considered as of authority in spite of the opposing weight of
decision and of reason, then I do not hesitate to say, that never having re-
ceived the sanction of the highest appellate court, nor been embodied in our
law by long and uncontested use, we ought, upon principle, to overrule them.

By Senator WAGER.  The question raised by the first point for the pris-
oner, that the court was illegally constituted, inasmuch as the two aldermen
had no legal authority to sit as judges thereof, has been so fully considered

in the supreme court and in this court, in the case of *The People* v. *Varian and others*, that I deem it unnecessary here to make any remarks upon it. The reasoning of the supreme court upon this point, in that case, is to me perfectly satisfactory, and establishes the constitutional right of the aldermen to sit and act as judges in the court of oyer and terminer. This conclusion also renders it unnecessary that I should pass an opinion upon the question made upon the argument, whether the aldermen, though not judges *de jure*, were judges *de facto*, acting under color of office, so as to render their acts valid as regards the prisoner upon trial. Some of the members of this court have expressed an opinion that their acts as judges *de facto* would be void as it regards the conviction in this case, if the constitution has abrogated their right to act as judicial officers ; but as I am satisfied that the constitution has not thus operated upon them, and that they *were judges *de jure*, I shall forbear expressing any opinion up-  [ *576 ] on this question. It would not influence my own judgment upon the final vote to be given by me.

It is alleged that the abandonment of the bench by the circuit judge during the progress of the trial, left the court illegally constituted, and consequently vitiated all the subsequent proceedings. This question depends upon the power of the *associate judge* to preside at the oyer and terminer and hold that court. If he had the same power as the first judge of the New-York common pleas, to hold it in connection with two aldermen, in my opinion he had a right to sit in connexion with the circuit judge, up to the period of abandonment ; and down to that period constituted one of the members of the court. By the revised statutes, 2 *R. S.* 204, § 28, courts of oyer and terminer may be held in the city and county of New-York, by one or more of the justices of the supreme court, or of the circuit judges, or by the first judge of the court of common pleas of that city and county, together with the mayor, recorder and aldermen, or with any two of them. The first judge of the county courts of the city and county of New-York, 2 *R. S.* 216, and the mayor, recorder and aldermen of the said city, or any three of them, of whom the said first judge, mayor or recorder are always to be one, have power to hold courts of *general sessions* in and for the said city and county of New-York. By the act of 1834, *Statutes of that year*, ch. 94, an *associate judge* of the court of *common pleas* for the city and county of New-York is authorized to be appointed, with the same power to hold *said* court as the first judge thereof ; and may equally with him, as presiding judge, authenticate the records of the court. The fourth section provides that the first judge and associate judge shall, except when sick, &c. have sole and exclusive authority at chambers touching any suit or proceeding in the court of common pleas. By the fifth section, " all the powers vested in the first judge, by virtue of the statutes of this state relative to any legal proceed-

ings, are given also to the associate judge ;" the section then provides that any proceedings commenced by one of said judges, may, in his absence, [ * 577 ] be continued, *decided and perfected by the other of said judges.

By the sixth section, the associate judge is clothed with the same power as the first judge, to hold and preside in the *general sessions* of the peace. The act provides that it shall continue in force for the term of five years. The act of 1839, *Statutes of that year*, ch. 116, under which Judge Inglis, the associate judge who presided in this case after the circuit judge left the bench, was appointed, provides for a continuance of the act of 1834, above referred to, and " that there should be appointed for the court of common pleas an additional associate judge, who is declared to possess all the powers now vested by law in the first judge of the court. If the act of 1839 stood alone and unconnected with the act of 1834, there would be some reason for believing that the legislature intended by its provisions to clothe the judge appointed under it, with all the judicial powers possessed and exercised by the first judge, and that under this authority he had a legal right to hold the court of oyer and terminer as the presiding judge thereof ; though, as a general rule, a power so important as that of presiding at a trial, where the life of a human being is at issue, should be clearly and specifically given, and not left to inference from any general delegation of authority.

But when two statutes are considered together, in order to give a proper construction to the act of 1839, and they may be so considered, for they are in *pari materia*, both seeking to add additional legal force to the court of common pleas, I think that great doubts at least will be entertained whether the legislature intended to clothe the associate judge with the power claimed for him by the counsel for the people. All that can reasonably be urged under the act of 1839 is, that it created an additional associate judge for the court of common pleas, and clothed him with the same powers with which the legislature had invested the associate appointed under the act of 1834. If the legislature in 1839, in consequence of discovering that they had not in 1834 gone far enough, and had not given full powers to the associate then provided for, intended to give him full power to pre- [ 578 ] side at and hold the *court of oyer and terminer, they would, beyond all doubt, have conferred the power in plain and explicit terms, and they would at the same time have raised the associate appointed under the act of 1834 to the same grade of power conferred upon the additional associate judge. They would not have sought to do this by a general grant of powers which is, at best, liable to a doubtful construction. If the general grant of power by the act of 1839 authorizes the additional associate to hold the oyer and terminer, it confers more power on him than the associate appointed by the act of 1834 possessed, by a fair and legal construction of the act, or than he exercised under a practical construction of

the act given to it in the city of New-York ; for it is understood, that prior to the act of 1839, the associate did not claim the power of holding or sitting in the court of oyer and terminer.   The fifth section of the act of 1834, in my opinion, conferred upon the associate appointed under it only such powers, " relative to any legal proceedings," as were solely possessed by the first judge by virtue of his office and the statutes of this state ; or in other words, power to do business at chambers as a justice of the supreme court, and such other business as he could perform alone, without the aid of other judges.   This opinion is derived mainly from the relation in which the words conferring the power stand to those which, in the same section, provide that " any *proceedings* commenced by one of said judges may, in his absence, be continued, decided and perfected by the other of the said judges."   The words " *any proceedings*," in the latter clause of the section, evidently refer to the same " *proceedings*" which are mentioned in the former clause of the section.   The latter clause controls and limits the general words of grant used in the former clause, and confines it to such business only as each of the said judges might transact singly by virtue of his office.   It can hardly be pretended that one of these judges, under the latter clause of the fifth section, would be authorized to commence a trial at the oyer and terminer or in the general sessions, and progress for some way in the trial *without the presence of the other, and then abandon the bench   [ *579 ] and leave the other to finish the trial.

My opinion in relation to the construction to be given to the fifth section of the act of 1834 is confirmed and strengthened by the fact, that the legislature in the sixth section of the same act deemed it necessary, by specific language, to confer upon the associate judge the power to hold the court of *general sessions* of the peace.   If the general power contained in the fifth section is as broad and extensive as is contended for by the counsel for the people, the sixth section was entirely unnecessary.   If it be said that it was added by way of more abundant caution, it may with force be asked, why did not the legislature exercise as much caution and circumspection in relation to the oyer and terminer, which is certainly as important a court as the other, and as well known to the public and the legislature ?   A fair, and as I believe a legal construction of the two statutes referred to will confine the powers of the two associate judges to the court of common pleas and the court of general sessions, and such chamber duties as could be performed by the first judge.

A construction, regarding the statutes, declaring the judges who may hold courts as a *designatio personœ*, without the power in any other persons or judges to hold them unless expressly authorized by the legislature so to do, would be doing no great violence to their meaning, and would not be productive of any public injury.   But as the view I have taken of

the acts of 1834 and 1839, renders this construction unnecessary, I forbear expressing a decided opinion upon this particular point.

The view I have taken, also renders it unnecessary that I should express any opinion upon the legal effect of the circuit judge's leaving the bench during the progress of the trial. Such conduct might break up the whole harmony and consistency of a trial by introducing entirely contradictory and conflicting decisions, whereby the prisoner upon trial, might be greatly prejudiced.

As it regards the reading of the *memorandum in pencil* on the [ *580 ] back of the coroner's inquisition, purporting to be *the testimony of Wright, the watchman, I think the court decided correctly. It had no marks of authentication about it except that it was an endorsement in pencil under the heading " Witnesses." It might have been written by a person not authorized. It should, at least, have had the signature. of the coroner to attest its genuineness, or it could not have legally been admitted to be read without preliminary proof showing that it was the testimony as taken down from the witness. It is true the coroner must be presumed to have done his duty in reducing the testimony of the witnesses to writing so as to have returned it together with his inquisition, but this he may have done upon another paper properly authenticated by him ; for there is nothing in the statute requiring the testimony to be annexed to the inquisition returned. I do not believe it was necessary that the deposition should have been subscribed by the witness, because I find nothing in the statute requiring it. But at the same time there would be a degree of looseness in admitting such a paper to be read without some marks of authentication, in all of which the writing is deficient. It was no part of the inquisition. That was complete without it ; for the finding of the jury is subscribed by them and by the coroner, but their names no where appear so as to authenticate the writing in question. There is nothing in the circumstance that this writing was found in the clerk's office with, and endorsed upon, the inquisition which entitles it to be read without preliminary evidence.

The first count of the indictment charges the crime to have been committed " of malice aforethought and from a premeditated design to effect the death of the person killed." The court charged that under this count, (the second having been entirely excluded from their consideration,) the jury might convict the prisoner of the offence described in either the first or second subdivisions of the fifth section of the revised statutes. 2 *R. S.* 657.

Since the decision in the case of *Enoch* by this court, 13 *Wendell*, 159, no doubt can be entertained, that a common law indictment, charging the offence to have been committed of *malice aforethought*, sim-[ *581 ] ply, would be good for either *of the offences described in the

first or second subdivision of the section. Had the indictment in question been so drawn, and without the additional words contained in the statute, " with a premeditated design," &c. no doubt could be entertained that the charge of the court to the jury would have been correct, and the conviction would have been good under the count. The error in the charge arises from regarding the count as drawn, as equivalent to a count according to the forms used at common law, where the words " of malice aforethought" were used to describe the malice or intent with which the crime was committed. The words malice aforethought, embrace both express and implied malice ; not so of the words, " a premeditated design to take the life of the person killed," used in the statute. They are not equivalent expressions. The one describes express malice, which Blackstone defines to be " where one, with a sedate deliberate mind and formed design, doth kill another." 4 Black. Comm. 199. The other embraces not only express malice, but also that malice which is to be inferred from the act of killing, but where there is a total absence of a deliberate and formed design to kill the particular individual who came to his death by the act complained of.

Although an indictment at common law would have been good, yet it by no means follows that the count in question is good. I regard the count in this indictment as equivalent in all respects, to one which should charge the murder to have been committed " from a premeditated design to effect the death of the person killed," following the language of the statute, without the addition of the words " of his malice aforethought." Such a count would most clearly be good for the offence described in the first subdivision of the statute, and yet it will hardly be pretended that it would support the charge of the judge in this case, and uphold the conviction, for an offence, which so far as I have been able to discover from the evidence, comes entirely within the offence described in the second subdivision of the statute, if it be murder at all. The words " and from a premeditated design to effect the death of the said Peter Fitzpatrick," used in this indictment, have a restraining and qualifying effect *upon the words " of his    [ *582 ] malice aforethought," which precede them. They limit and control their neaning so as to give to them the effect of describing express malice. I think the error of the court below upon this point arises from their regarding the words " and from a premeditated design" as an interpolation, without any qualifying effect ; and that they might be stricken out without changing the meaning of the indictment.

The principal reason assigned in the case of Enoch, for holding the common law indictment good, is that the statute, as far as it goes, simply defined the crime of murder as it existed at common law, and is therefore declaratory. But there is nothing in that case which goes to show that where a specific intent and formed design is charged in the indictment, the prisoner

can be convicted upon proof, where malice is merely implied from the fact of killing. Indeed the law always requires the allegations in the indictment which are of substance to be proved. In criminal proceedings intent is always of substance. *Chitty* says in his *Cr. law, vol. 3, p.* 1098, on the subject of burglary, if the particular intent be averred, it must be proved as laid. If not, it is fatal. Suppose, at common law, an indictment to charge a murder to have been committed of malice aforethought, and " with a sedate and deliberate mind and formed design to take the life of the person killed," using the language which *Blackstone* used to define express malice, words equivalent to those used in the first subdivision of our statute, could the person thus indicted be convicted of an offence where there was no express malice, no intention to take the life of any particular individual? I think not, for that would be convicting the prisoner of an offence with which he did not stand indicted. You might as well convict a prisoner of the offence of killing B. when he had been indicted for the killing of A. Regarding the first count of the indictment as describing the particular offence which the prisoner was called upon to answer, the court were clearly wrong in directing the jury that they might find him guilty of an offence described in the 2nd subdivision of the statute. It was an offence which [ *583 ] he was not called *upon to defend himself against under the first count. And I think this view is clearly borne out by the cases cited on the argument, and particularly by the case of *Regina* v. *Dean and al.* 4 *Lond. Jurist*, 364, decided in the court of queen's bench, in 1840.

It is possible the conviction might have been upheld in this case, under the second count in the indictment, had not that count been entirely excluded from the consideration of the jury by the court. I am of opinion that the second count was good according to the law laid down in the opinion of Judge Bronson in the case of *Rector*, 19 *Wendell*, 606, where he says, " If a man assault another with intent to do him a bodily injury and death ensues, malice sufficient to constitute murder will be presumed, if the act be of such a nature as plainly and in the ordinary course of events must put the life of the party in jeopardy. This doctrine, he remarks, will be found in every book which treats of the crime of homicide, and it is now a part of our statute law, though expressed in different words." He then cites the language of the 2d subdivision of the fifth section of the revised statutes, as above referred to, as sustaining his position. His remarks were pertinent to the case then under consideration. The killing in that case was by beating an individual with the bar of a door, an unusual and dangerous instrument, with which to beat a man. If the judge's opinion be law, I think the count was good and might have been retained and the case submitted to the jury under it, though the judge's opinion does not exactly square with mine in relation to the construction which should be given to the second subdivision of

the statute. I had supposed that the circumstances of such a case as is mentioned by the judge, would be evidence of a formed and deliberate design to kill the particular individual who was assaulted and beaten. If one shoot a gun at ano.her, it is evidence of such design. So if he strike with a weapon which would " plainly, and in the ordinary course of events, put the life of the person in jeopardy." The second subdivision of the statute, I think, embraces an entirely different class of cases: as where one shoots into a crowd, or throws a deadly missile into a throng, [ *584 ] or thrusts about in a crowd with an instrument which he has good reason to believe will produce death to some one he cares not who. Where there is an unlawful beating with an unusual instrument, and the intention to kill is not evident from the circumstances, I suppose the case comes within the 10th or 12th section of the statute, 2 *R. S.* 661, in relation to *manslaughter*, and would constitute that crime. But whether the count was good or bad, it having been entirely withdrawn from the consideration of the jury, it cannot now, in my opinion, be pressed before the court for the purpose of upholding the conviction. The prisoner was convicted upon the first count under an erroneous charge from the court in relation to the law of the case ; and there being great doubt whether, upon the facts he should not have been convicted of manslaughter instead of murder, I cannot consent that this count should be raised up to sustain his conviction.

In relation to the other branch of the judge's charge, in the naked and unqualified manner in which it comes to us, I am of opinion it was calculated to prejudice the prisoner and take from him the advantage of such reasonable doubts as existed in his case. It was certainly in the unqualified manner in which it is spread out upon the bill of exceptions, equivalent to telling the jury that the, want of evidence of good character on the part of the prisoner was evidence of positively bad character, and gave the prosecution the advantage of that bad character, which they could not be permitted to show by positive testimony.

On a view of the whole case I think the judgment below should be reversed ; and the prisoner remanded for a new trial.

On the question being put, *Shall this judgment be reversed?* All the members of the court, (22 being present,) with the exception of one Senator, voted in the affirmative. Whereupon the judgment of the supreme court was *reversed,* and a new trial ordered.