By the Court. Sandford, J.
Whatever might have been our view of the effect of the defendant’s covenant, if it had been an open question, we are required by the authority of the case of Allen v. The Merchants' Bank, (22 Wend. 215,) in the court for the correction of errors, to give our judgment for the plaintiff. It was there settled that, on the deposit of a bill of exchange with a banker residing here, for collection in another state where it was payable, the banker was liable to the holder for any neglect or omission of duty, in respect of such collection, on the part of his agent, or the notary employed by him, in the foreign state.
The principle established was, that the implied contract of the banker was an understanding to do the thing itself, and was not the delegation of an agent or attorney to procure the thing to be done. That the contract looked mainly to the thing to be done, and his undertaking was for the due use of all proper means for its performance; and it was not a contract only for the immediate services of the agent, and his acting faithfully as the representative of his principal. That in the latter case, the responsibility ceases with the limits of the personal services undertaken ; in the other, it extends to cover all the necessary and proper means for the accomplishment of the object, by whomsoever used or employed.
In the case at bar, the defendant for a valuable consideration undertook the collection of a bond and mortgage. He covenanted in express terms “ to take prop&r means'” to collect the amount secured to be paid by them; and he is therefore clearly responsible that such means should be taken, by every person whom he employed, to execute his covenant. The retainer of a competent solicitor was undoubtedly a proper step to be taken, and as far as it went, was a compliance with the contract. But the responsibility did not cease there ; and if the solicitor failed to pursue the proper means for collecting the securities, the defendant must answer for his default.
It was contended that proper means were taken in this case; that the long delay which occurred was the result of no oversight on the part of the solicitor employed; in his judgment it *190 was inexpedient to proceed under the circumstances, and his corase was the true one.
The good faith of the solicitor is not impeached. This, however, did not satisfy the covenant; nor did the exercise of his judgment, if that judgment were wrong, and caused unreasonable delay. We have considered the question with more than usual care and deliberation, and we cannot resist the conclusion, that the corase pursued by the solicitor was unwise, and in respect of the defendant’s duty to Hoard, was entirely unwarrantable. Ho good reason is shown why the foreclosure of the mortgage was not commenced immediately after the defendant received it. Passing by the nine months thus lost before proceedings were instituted, in December, 1844, the solicitor became fully informed of all the difficulties in the case, by the answer of Adams and wife. He should then have brought Mrs. Adams’ trustee before the court at once; by an amendment of his bill. If this course had been pursued, the bill afterwards filed by Mi’s. A. and her trustee would never have been exhibited, or, if exhibited, it -would have been no more than a cross bill in the foreclosure suit, disposable either summarily, by a demurrer, or more deliberately, by being carried forward with the original suit. Whether Mrs. A.-’s bill had been filed or withheld, if the original suit had been pressed on with ordinary diligence, after the receipt of the answer of Adams and wife, there is no doubt that it would have been brought to a hearing, and a decision obtained, before 1846. Even after the bill of Mrs. A. and her trustee was exhibited, the defendant could have expedited either the one suit or the other, and brought the matter to a conclusion. But he did neither. He was entirely passive from December, 1844, until after this suit was commenced, a period of more than two years and a half. It is said the marriage settlement of Mrs. Adams presented a doubtful and difficult question. If it did, there was the more reason for urging on the suit, because a greater delay would be inevitable, if the suit were to be litigated.
Without dwelling upon the subject, it suffices to say, that proper means were not taken by or in behalf of the defendant, *191 to collect the bond and mortgage, and he is liable for a breach of his covenant.
The inquiry remains, what is the extent of that liability % It is said, on his part, that the mortgage was either good or bad: if it were bad, he could collect nothing; if it were good, the plaintiff has lost nothing. This, we think, is not sound. The mortgage, however good it may be, avails the plaintiff nothing, so long as the defendant retains it, and neglects to collect it. He sustained his damages, (if it were good,) two or three yearn since, when he was entitled to receive his share of the security, and received nothing. His injury is the same as if he had held the defendant’s note, payable at that time, and it had remained unpaid.
As to the amount of damages; the amount of the bond and mortgage is its presumptive value. It belongs to the defendant to prove it to be a doubtful or a worthless security. (Ingalls v. Lord, 1 Cowen 240; Allen v. Suydam, 17 Wend. 370; S. C. 20 Ibid. 321; Patterson v. Westervelt, 17 Ibid. 543.) Ho attempt was made to impeach the value of the security, in respect either of the adequacy of the mortgaged premises at the time of the transfer, or the solvency of the obligor in the bond; but it was contended that the premises were vested in Mrs. Adams’s trustee, and the mortgage never became a hen upon them. The obligor’s responsibility would still remain, if this were all true. It was proved that the lands mortgaged had been sold under the power in the will of Mrs. A.’s father, and produced the gross sum of $1850, which, after the commissions and expenses were deducted, would not have paid the mortgage and the interest which had accrued, when this suit was commenced.
Then, as to the validity of the mortgage as a lien. The bond was equitably converted into personalty, by the will of Mrs. Adams’s father; and as such, it appears to us was wholly within her control by the provisions of the settlement, and was, by her act in mortgaging it, subjected to the payment of this debt. (North American Coal Co. v. Dyett, 7 Paige 14; S. C. 24 Wend. 573; Gardner v. Gardner, 7 Paige 116; S. C. 22 Wend. 528; Leaycraft v. Hadden, 3 Green’s Ch. R. 512.) We need not, however, decide this point. The damages *192 are subject to adjustment; and in ascertaining the amount, (which will be done at chambers,) proof may be made, of what was stated at the argument, that the defence to the mortgage on the marriage settlement, had been abandoned.
Another consideration will arise on the adjustment. It is obvious that if the foreclosure had been pressed to a sale prior to 1846, the undivided fifth of the farm, sold by itself, and subject to the power of sale vested in the executors of Mrs. A.’s father, would not have produced as much as it has done by the sale of the entire farm under the power. Referring this and the details of the damages to future adjustment, we will at this time order judgment for the plaintiff for the amount thereby to be ascertained. (a)

 After hearing counsel, and receiving some evidence by consent, the court adjusted the damages as follows:
Assuming the whole farm to have been worth as much in 1845, as when sold in April, 1846.
A reasonable time to have collected the mortgage and sold the premises would have brought the collection to, say, Oct. 1845.
Value of whole farm, then, say,.......$9350 00
Of which, allow for executor’s expenses, &c., and commissions, which, whether sold on foreclosure or not, would have finally been a charge on the proceeds; also auction fees, advertising, &c., &c.....$ 500 00
8750 00
One fifth, is 1750 00
(The share actually realized, as Mr. Sedgwick says, $1736 80)
If it had been sold in 1845, undivided, and subject to the power of sale in the executors, there being no one creditor with sufficient interest in the matter to buy it in, it would have brought, say 10 per cent less, . . $ 175 00
1575 00
From this, deduct cost of foreclosure on bill and answer, say, $75 00
Counsel fees, $75 to $100 ....... 75 00
Master’s bill on sale,........ 50 00
(Mortgagor insolvent, &c.)........ $ 200 00
Net proceeds, in October, 1845, 1375 00
Gamer was first to retain the amount of his own note, viz. $600 31
And interest from Jan. 15,1844. Int. 1 year 9 months, 73 53
- $ 673 84
Bal. for Auchincloss & Hoard,
701 16
*193 Brought forward, ....
701 16
Int. from Oct. 15, 1845, to Oct. 27,1849—4 years 12 days,
197 94
Amount, on this computation,
899 10
If we take the actual result of the executor’s sale, and make no allowance for depreciation on sale of an undivided interest, the matter will stand thus:
Proceeds
1736 80
Exp. of foreclosure, say 8200 to
225 00
1511 80
Gamer’s debt, 15 Oct. 1845
673 84
837 96
Int. 4 years and 12 days,
236 55
Judgment for plaintiffs for .
81074 51
As to collateral suit of Gilbert, it probably would not have existed, if the foreclosure had been diligently prosecuted. The other suit unimportant.