Present, EDWARDS, MITCHELL and ROSEVELT, Justices.

### THE PEOPLE v. JOSEPH CLARK.

### THE PEOPLE v. JAMES SULLIVAN.

The design to effect death, which is necessary to constitute a homicide murder, must have been premeditated; not the thought of a moment, but the calm, deliberate reflection, which has occupied the mind. The design must have been thought of, and meditated, before the act is committed; must have been formed before the moment when the crime was perpetrated.

In both these cases the accused had been severally convicted of murder at the New York Oyer and Terminer, in September, 1851.

In both cases the presiding judge had charged the jury that if they believed that the fatal acts had been done by the accused with a design to effect death, the offense would be murder, even though such design was formed only on the instant, accompanying and causing the act, and that the nature of the instruments used, the manner in which the assaults had been made, and the circumstances attending them, were all legitimate subjects of consideration for the jury in their endeavors to ascertain the intention or design with which the acts were done.

Exceptions having been taken to these charges, both the cases were removed into this court by writs of error, and were here argued together.

*R. H. Morris*, for the accused.

*N. B. Blunt*, district attorney, for the people.

The following opinions were delivered :

*Mitchell, J. :* In each of these cases, the plaintiff in error was indicted for murder, tried, and found guilty. In each case, the judge at the Oyer and Terminer, charged the jury, that if they believed that the killing was produced by the prisoner, with an intention to kill, though that intention was formed at the instant of striking the fatal blow, it was murder.

To this charge there was an exception, as well as to other parts of the charge; and the question has been very fully and ably argued, whether an intention to kill, formed at the instant of striking the fatal blow, is a premeditated design to kill, within the meaning of the Revised Statutes. The statutes declare the killing to be murder ; first, when it is perpetrated from a premeditated design to effect the death of the person killed, or of any human being; secondly, when it is perpetrated by an act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any such design against any particular individual; and thirdly, when it is perpetrated by one engaged in the commission of a felony, although without any design to effect death. The revisers say, in their note to this section, that the great principle on which it rests is, that to constitute murder, there should be an express design to take life (which seems to be the first case provided for), or such circumstances as to induce a very strong presumption of such design, or such facts occurring in a transaction as would ordinarily lead to the result of taking life. The two last cases, no doubt, were provided for in the second and third subdivisions.

They also state, that there was nothing so much wanted in the criminal law, as a settled line of distinction between murder and manslaughter, which were then so nearly connected, and ran into each other so much, that a lamentable uncertainty prevailed, which operated as well to screen the guilty, as to expose the innocent; and that the first step to such a distinction, was a definition of murder. It is evident, therefore, that it was their intention to use language which

should be so clear as to remove this uncertainty, and to make it unnecessary to examine the former adjudications on this subject. For, if the former law was to be retained, and the former decisions resorted to as authority as to what the present law should be, all the old uncertainty must still remain. The same motives must have influenced the legislature, for this uncertainty was but faintly portrayed by the revisors, as any one will experience, who will attempt to reconcile the old decisions; and there was no subject which needed revision more, both on that account, and on account of its vast importance.

The revisors accordingly abandoned the technical phrase, which was appropriated to the description of the motive of the murderer — malice aforethought — and which had, in process of time, acquired a legal meaning, different from its primitive meaning, and substituted the untechnical words, "premeditated design," that a law in which the whole State, and every individual in the State may be concerned, might be understood by each, in the sense which every man, professional or not, would, on the first impression, believe it was intended to have. Does, then, the expression "premeditated design" admit of the meaning given to it by the Oyer and Terminer? Without relying on the definitions of lexicographers, we may safely resort to the illustrations which they have given of the use of words. None of them give a single illustration of the word to meditate, in which the idea of a considerable space of time is not contained as intervening during this operation of the mind. The word "meditate" comes to us from the Latin, and perhaps through the French. Ainsworth has collected instances of its use in those Latin authors whose works form the foundation of our education. They are — to forecast; to meditate or study how to plead a cause, or how to speak; meditate going into exile, or a flight, or snares, or deceit against another, or punishment against a brother, or an armed expedition into India. The illustrations in the dictionary of the French Academy are — to meditate a truth; an idea; rules of eloquence; an enterprise; a project; the ruin

of another; a good or bad action; or to retreat from the world; and they say, proverbially, " a man of ready wit comes sometimes to as happy results as if he meditated," making a complete contrast between meditation and the hasty thought, which in the same instant is followed by action. Their definition of meditation makes the contrast still greater. It is, " an operation of the mind, which applies itself to reach the depths of any subject or matter." The mind which seeks to reach the depths of any subject that is worthy of reflection, must be long occupied before its wishes can be gratified. Can one be said to meditate the banishment of another, or snare, or deceit, or the punishment of another, or his own flight, or the invasion of a foreign country, if he does not allow a considerable interval to elapse between the first formation of the design and its execution ? Cæsar said of one of his conquests, *veni, vidi, vici ;* and all understand it as a proud boast, that, as soon as he reached and saw the enemy's country, he conquered it. How completely would he have reversed this meaning, if he had said : " On my arrival, I meditated on my design, and accomplished it." The admission that he meditated would have showed that there were difficulties which delayed him, and required some management before they could be overcome. So, to turn to the French illustration, can one be said to have meditated on an idea, on an enterprise, a project, the ruin of another, a good or bad action, who performed the action at the very moment the thought was formed ? So, when " meditations on death " are spoken of, do men mean the thoughts of a moment, or the calm, deliberate reflections which may have exercised the mind for hours or years, or even the most of one's life ? The only illustrations given by Webster correspond with these. One is from Washington, who says : " I meditate to pass the remainder of my life in a state of undisturbed repose ; " and the other from that book which is in every body's hands or hearing, and is one of the best sources of pure English : " His delight is in the law of the Lord ; and in His law doth he meditate day and night." Psalm I. These quotations show the general and popular

understanding of the word, and that is the legislative understanding, where technical words are not used, or words relating to a trade or art. But here the legislature has used still stronger words, viz.: "premeditated design." There must be, therefore, not only the design to kill, but that design must have been the subject of meditation or reflection before, as the prefix *pre* clearly requires. Before what is this premeditated design of killing to be, except before the act that was meditated, viz.: the fatal blow by which the killing was accomplished. The very requirement that the design shall be thought of and meditated before the act shall be committed, which is the cause of death, admits that there is an interval between the design or intention, and the commission of the act. We have no right to strike out so material a part of the word as this, which gives a peculiar force to the ordinary meaning of the rest of the word. This interpretation of the word also corresponds with the expressed views of the revisers, which seem to have been to confine this part of the definition of murder, to what was frequently called cases of express malice, which is thus defined by Blackstone: "Express malice is, when one with a sedate, deliberate mind, and formed design, doth kill another; which formed design is evidenced by external circumstances, discovering that inward intention, as lying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm." (4 Bl. Com. 199.) These external circumstances are all of a nature which show a design formed before the moment when the crime was perpetrated; and the sedate, deliberate mind, and formed design, are descriptive only of a mind deliberating on, and then sedately carrying out its design.

In Tennessee, the term premeditated is one of those used to define murder in the first degree, and in 10 Yerger, 551 (*Dales' case*), the court said premeditation was a "design to kill, formed before the act." In *Davis' case* (2 Humphrey, 439, 442), they say, that the employment of a deadly weapon, although it implies malice at the common law, does not imply that the act was done with premeditation, so as to make it murder

in the first degree. In Virginia, in *Jones' case* (2 Leigh's Va. Rep. 598, p. 611), the court say, that the death must be the ultimate result, which the concurring will, deliberation and premeditation of the party accused, sought.

In an early case in Pennsylvania (4 Dallas, 145, *Mulatto Bob*), the court instructed the jury that the offense was willful, deliberate, and premeditated (this would seem to have been a clear usurpation of the province of the jury); the judge then admitted that the statute made premeditation an essential ingredient to constitute the crime, yet added, that still the intention remains as much as ever the true criterion of the crime. This, in some sense, is true. The intention is one of the true criteria of the crime; but, as the judge admitted, and every one else must admit, it is not the only true criterion, for then the intention to kill being established, the jury are to inquire no further, and all intentional killing is murder, though committed in self-defense, or against a burglar in the act of breaking into one's dwelling-house, or in the heat of passion in a combat provoked by the deceased, without any undue advantage being taken, or any dangerous weapon being used, and under the honest, though erroneous belief, that it was the only means of saving the life of the accused.

In Ohio (12 Ohio Rep. 52, *Shoemaker's case*), the court held, that if the accused premeditated the fatal act, he was guilty of murder in the first degree, " however short the time might have been between the purpose and its execution;" that it mattered not how short the time, if the party had turned it over in his mind, weighed and deliberated upon it; but it was conceded, that the offense was not committed, when the design was so hastily formed, or premeditated and executed, that time did not intervene for deliberation. In 2 Tenn. Rep. 8 (*Anderson's case*), the court says: "The law knows of no specific term within which an intent to kill must be formed so as to make it murder. If the will accompany the act, a moment antecedent to the act itself, which causes death, it seems to be as completely sufficient to make the offense murder, as if it were a day, or any other time."

Whether the rule thus laid down is not too harsh to be consistent with the term premeditated, is not now before the court; but the position is clearly admitted by it, that some period of time must intervene between the intent and the act.

In our own State, in the *People* v. *Enoch* (13 Wend. 159), the meaning of the first subdivision of this section of our Revised Statutes was incidentally passed upon, and Chief Justice NELSON considered it as confined to express malice, or malice aforethought, according to its sense in common parlance, and as originally used. (Id. p. 164.) The chancellor also said that "the meaning of the term 'malice aforethought' had been enlarged so as to include implied malice by *judicial construction*." (p. 164.) In *White's case*, Senators Furman, Verplanck and Wager concurred in the view that the words "premeditated design," as used by the statute, limit the signification of malice aforethought to express malice. (24 Wend. 558, 569, 581.) There are some cases at Oyer and Terminer, in which the rule adopted in the court below was laid down; in one the party was acquitted, perhaps on account of the jury seeing no alternative between an absolute acquittal and the punishment less than death, which the party may have deserved. But the rule has never, it is believed, received the sanction of the court after an argument at a general term, or in bench. It does not correspond with the spirit of the day, actuating not classes only, but all parties, which is, that the penalties of the law should be mitigated, and that by this means the object of the law in securing a certainty of conviction where guilt is proved, may be more effectually accomplished. It was argued that the words used by the judge in his charge, were "intention (not design) to kill, formed at the instant of striking the blow;" and that intention always implied, and was the result of, premeditation. The court below would be unwilling to adopt this argument, or to allow a jury to be as much misled as they would have been by this charge, if such a meaning were intended. That court have themselves defined the word by their own use of it. They speak of the intention, and say it is enough, "though

formed at the instant of striking the fatal blow." The inten-
tion, therefore, that they spoke of, was such as could be
formed " at the instant," and needed no premeditation. This
part of the charge was material to the case; and although, in
the case of Clark, there are circumstances from which the
question may be raised, whether it ought not to be left to a
jury to say whether he was not guilty under the second sub-
division of the section, still, that was a matter not left to
them, and which the court ought not to take from them, so
far as the intent of the accused is concerned, and probably in
other respects, and is a question which the court do not now
wish to pass upon.

A new trial should be granted before the court of Oyer and
Terminer, in both cases.

*Rosevelt, J.,* delivered the following opinion :

On the trial the defense rested mainly on two points —
first, that there was no premeditation; and secondly, that the
act, although unjustifiably severe, was defensive — and that,
in either view, the case was one of manslaughter, and not
murder.

The court, among other things, charged the jury that, under
the evidence in the cause, there was no sufficient excuse shown
for the violent interference of the prisoner; that the mere fact
of Brown and the policeman Sullivan being engaged in the
alleged quarrel, shown by the evidence, was not sufficient to
justify the assaults upon Gillespie, and that so far as deceased
was concerned, it did not appear that he had given offense to
any one. The court further charged, 'that if the jury
believed that the killing was produced by the prisoner, with
an intention to kill, though that intention was formed at the
instant of striking the fatal blow, it was murder ; and that
the jury might infer such intention from the circumstances of
the case, and, among other things, from the nature of the
weapon, and the wounds given by it.

The first part of this charge, upon a more deliberate review,
can hardly be said to do full justice to the position of the

parties. It assumes that Brown and the policeman Sullivan were alone engaged in the quarrel; whereas the proof shows that the deceased, from the kindest motive, no doubt, was the first to lay hands upon Brown, gently, it is true, but still, as the resentment of the latter shows, offensively. Sullivan and the deceased clearly coöperate, and although Sullivan alone used the club, both, in judgment of law, were responsible for that act, lawful or unlawful. Had death ensued to Brown, both must have been tried for the homicide; and on such trial, both must have been required to prove that they were engaged in " the discharge of a legal duty,' and that the act, however deplorable, was necessarily committed in overcoming actual resistance." Was it then the legal duty of the policeman, after the gathering had dispersed, and quiet was restored, to compel by force the two remaining persons, standing on the sidewalk in front of their own homes, to go in, whether willing or unwilling? If it was not, what must have been the result of such trial? A verdict of manslaughter, in one or other of the four degrees, would seem to have been very probable. Brown, however, although thus assaulted, and with a dangerous weapon, in point of fact was not killed, but only severely wounded. But did the circumstances furnish no excuse for interference in his favor? Had it been the case of a wife, parent, child, master, mistress, or servant, and there had been reasonable ground to apprehend iminent danger of some great personal injury, the law would have justified interference even to the point of killing. Although Brown stood in neither of these relations to the prisoner, and may have been, as far as we know, a mere stranger, yet the spirit of the law, in some degree, at least, may certainly be invoked to mitigate, what otherwise would seem to be not only an atrocious, but utterly motiveless and inexplicable deed.

Next as to the prisoner's intention to kill. This clearly could not be inferred from the nature of the weapon alone, unless we go back and apply the same rule to the use of the club by Sullivan upon the head of Brown. The club and the rung were alike dangerous weapons. Death might result from

the use of either. But the prisoner, it is said, after an interval, repeated his blows, and so did Sullivan.

Admitting, however, that there was no palliation; that there was an actual intention to kill, but that such intention was only *formed at the instant of striking the fatal blow*, was the act manslaughter, calling for incarceration in the State prison, or was it murder, to be expiated only on the gallows?

The law says, that killing without authority, *when perpetrated from a premeditated design* to effect the death of the person killed, or of any human being, is murder. Is, then, an intention formed on the instant, a premeditated design? Consulting merely the popular acceptation of language, or even the dictionaries in general use, we must certainly answer that it is not. So far from being synonymous, these two forms of expression are generally employed to convey directly opposite ideas. An extempore discourse is understood to be the antipode of a premeditated one. The words premeditate and design both import forethought, careful reflection, deliberately arranged purpose; ideas all involving, in their structure, the essential element of *time*. We may not perhaps be able, in every or any case, to define the precise number of hours or days; but still there must be time, reasonable time, time for reflection, time to survey the contemplated deed in all its bearings and probable results, and to contrive and arrange, if so decided, the means and method, and occasion of its deadly accomplishment. How, then, can it be said, without shocking all our notions of speech, whether common or cultivated, that an intention to kill, formed on the instant of striking the fatal blow, is the same as a *premeditated design* to commit the crime of murder? The present law of homicide, it must be remembered, is, in this State, a written and a recent code. It is composed by men selected to give utterance to the more humane spirit of the age, and in language adapted, or at least intended to be adapted, to the general understanding of those whose conduct it was to regulate. This consideration, therefore, must furnish the rule for its interpretation. And with such rule, or even without it, it seems impossible to believe

The People v. Joseph Clark and James Sullivan.

that the legislature, in treating the subject of homicide, and measuring its criminality and punishment, intended to place *sudden impulse* upon the same footing as *deliberate malice*. To do so, instead of softening, would have been to aggravate the harsh features of the common law, and to violate the almost universal sentiment of the community.

But, says the district attorney, if the crime of the prisoner (and a great crime it is admitted to be) is not adjudged to be murder, the criminal, contrary to all just notions of the adaptation of punishment, will escape with the comparatively slight punishment assigned to manslaughter in the fourth degree, not exceeding two years' confinement in the State prison. If this result were to follow as a necessary consequence of a reversal of the judgment of the court below, it would afford no reason for hanging the offender. It would merely show that in framing a system of written law, an oversight not very uncommon in such cases had occurred, to be remedied, not by the judiciary, but by the legislature.

If, however, the meaning above ascribed to the word " design," as used in the statute be the true one ; if it imply forethought, contrivance, laying in wait, deliberate purpose, then there is no difficulty, should the case call for such a verdict, in bringing it under the head of manslaughter, in the first or second degree, and applying to the crime such punishment, extending even to imprisonment for life, as may be justly adapted to whatever circumstances of aggravation may have attended its commission.

My conclusion, therefore, is that the verdict should be set aside, and a new trial ordered.

*Edwards, J.,* concurred. New trial granted.